2022 IL App (2d) 200280-U
No. 2-20-0280
Order filed September 14, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-CF-2986 |
| MARK A. DOWNS, | ) ) ) | Honorable Donald Tegeler Jr. |
| Defendant-Appellant. | ) | Judge, Presiding. |

**ORDER**

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

¶ 1    *Held*: The trial court's determination that trial counsel was not ineffective was not manifestly erroneous.

¶ 2    Defendant, Mark A. Downs, was found guilty after a jury trial and was sentenced to 70 years in prison. In *People v. Downs*, 2017 IL App (2d) 121156-C (*Downs* V), we remanded this cause for further proceedings on defendant's claims that trial counsel provided ineffective assistance. Following a full evidentiary hearing on defendant's claims, the trial denied defendant's motion for new trial. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4　　This case returns to us for the sixth time, after a proper adversarial second-stage *Krankel* hearing. The sole issue in this appeal relates to the performance of trial counsel, David Kliment, regarding the State's motion *in limine* to prohibit defendant from cross-examining Ruben Davila in reference to the details of the murder of Antonio Yepiz.

¶ 5　　　　　　　　　　　　　　　　A. Initial Trial

¶ 6　　Ruben Davila was a critical witness for the State and was the only witness who could identify defendant as the person who shot and killed six-year-old Nico Contreras. See *People v. Downs*, 2012 IL App (2d) 100755-U, ¶¶ 2-19 (*Downs I*). Davila had reached an agreement with the State. In exchange for his testimony, he would not be charged with the September 29, 1996, murder of Antonio Yepiz and would instead plead guilty to aggravated discharge of a firearm in the Yepiz shooting. The sentence would be "[eight] years in the Illinois Department of Correction, with a recommendation for the Impact Incarceration Program." The State took the position that the agreement was fair game for cross-examination "as it relates to the Yepiz murder and [opined that] the defendant should be allowed to pursue that issue on cross-examination, however any details of the murder would not be relevant." The State cited *People v. Santos*, 211 Ill. 2d 395 (2004), for the proposition that the details of the Yepiz murder were collateral. The State also cited *People v. Pecoraro*, 175 Ill. 2d 294 (1997), for the proposition that only proof of conviction of a crime can be used to impeach a witness's character, while proof of arrests, indictments, charges, or the actual commission of a crime are not admissible.

¶ 7　　During argument on the motion, the State acknowledged that Davila could be impeached by the deal and the fact that he would not be charged with the Yepiz murder was "relevant to show his bias." The State argued that "where Yepiz was shot, [or] who was with him," was irrelevant as to "whether Ruben Davila [was] a credible witness," and that those details constituted "collateral

issue[s]." The State further argued that, pursuant to *Santos*, the test to be applied in determining whether a matter is collateral is "whether the matter could be introduced for any purpose other than to contradict." Trial counsel Kliment argued that the State was using a "multiple murderer to try and convict Mr. Downs of the murder of Nico Contreras." Kliment referred to Davila's grand jury testimony in which he was asked, "What did Elias Diaz[1] tell you to do in regard to Tony Yepiz?" Davila had responded, "To basically get rid of him." Kliment argued that he had expected Downs to testify that he was told to "get rid of Saltijeral, but he didn't want to do it, he was hesitant and he wanted to shoot up in the air." Kliment argued that Davila's grand jury testimony contradicted Downs' expected testimony. At that point, the trial court interrupted Mr. Kliment and asked whether Kliment intended to get into all the details of the Yepiz murder. Kliment answered as follows:

> "Not all of the details, but some of the details. What happened after you[, Davila,] asked [Yepiz] to get out of the car to talk to him? [Yepiz] said he had to use the bathroom. And as soon as he passed [Davila], [he] shot [Yepiz] in the back of the head.
>
> I think the people sitting in the jury need to know the character of the person that they are asked to rely upon to convict this man of first[-]degree murder. And I think the fact that he can't be convicted of this crime, he made a deal. He can't be convicted of almost anything because he has this deal with the State.
>
> But I don't think that getting into some of the particulars of this crime is in any way wrong to show the people of the jury who they're being asked to believe."

---

[1]Diaz was a fellow gang member and the getaway driver; he remained in the car during the murder.

The trial court stated, "Unfortunately, the law is against you. I know you've read the case of *People v. Santos*. Specific act impeachment is prohibited in Illinois." Kliment responded, "I'm trying to show the jury his character. It's not impeachment." The trial court stated, "Rose by any name still smells sweet. Can't do that." The trial court limited Kliment's cross-examination to the terms of the agreement and told Kliment, "You can't get into all the bad acts he may have perpetrated in his life specifically and each fact. It's a collateral matter." Mr. Kliment strongly disagreed with the trial court, saying that the jury is "gonna [*sic*] be fooled" and that "Mr. Downs will be denied a fair trial because of that." The trial court commented that it was bound by our supreme court's holdings. Mr. Kliment then said, "I think the only way to get them to change bad law is to make a better decision down here and have it go up again." Mr. Kliment commented that, because of the deal the State fashioned, "the jury [wouldn't] get to know what really happened." Kliment continued, "Aggravated discharge of a firearm, I can't even describe the offense to them. Because he didn't commit aggravated discharge of a firearm. He committed first[-]degree murder." The court stated, "My job is to follow the law. If the Supreme Court feels that this is the way it should be, then I have no choice but to follow the law."

¶ 8    During Davila's direct testimony, the State discussed certain aspects of Davila's agreement, but did not discuss the Yepiz shooting. Mr. Kliment's cross-examination was extensive. While asking Davila about the benefits he was receiving for his testimony, Kliment asked Davila about the Yepiz shooting and if Davila knew Yepiz. The State objected, and the trial court sustained the objection. Mr. Kliment asked for a sidebar. At the sidebar, Kliment stated that the trial court's earlier ruling allowed him to question Davila about what was in the agreement. The court asked, "[I]s that in the agreement?" Kliment said, "No, I'm asking him that question." The State then said, "[H]e's going to get into the specifics." Mr. Kliment said, "If your ruling is I

can't read beyond, go beyond what's in that agreement, I'll follow the ruling." The court stated, "It is." Kliment again said his client is not "gonna [*sic*] get a fair trial because of this."

¶ 9    Mr. Kliment asked Davila, "[Y]ou testified to a statement Mark Downs made to you allegedly on the night of the shooting that you had done a lot for the mob?" Davila was asked what he had done for the mob, and he answered, "Some shootings." Kliment asked him how many shootings he had done for the mob and Davila responded, "I didn't count." However, he admitted that he had "maybe" done more than ten. When asked whom he shot at, the trial court sustained the State's objection.

¶ 10    During the State's re-direct examination of Davila, the subject of the Yepiz shooting was not inquired into. At the end of its re-direct, the State asked whether the parties could take a break to discuss Davila's re-cross examination. Following the break, the trial court announced, outside of the presence of the jury, that the parties had reached an agreement regarding re-cross-examination. The State commented that, with respect to the Yepiz shooting, "[Kliment could] get out to ask the witness about the fact that [he was] not being charged with that murder," or "[t]hat he has made statements basically with immunity that he committed that murder." During Kliment's re-cross-examination of Davila, the following exchanges took place:

"Q. Now, going back to your agreement. Remember the agreement?

A. I don't need to see it.

Q. Part of the agreement is you're pleading guilty to the offense of aggravated discharge of a firearm arising from the shooting of Jose Antonio Yepiz?

A. That's correct.

Q. What is not stated in the agreement as it's written is you are not going to be charged with the murder of Tony Yepiz which you confessed to in a statement to the police?

A. That's right.

Q. You also have not been charged with the murder of Nico Contreras?

A. That's right.

Q. Nor do you expect to be?

A. That's right.

MR. KLIMENT: Nothing further."

¶ 11    After the State rested, the defense recalled Davila. Mr. Kliment asked Davila about the eight-year sentence he had agreed to for aggravated discharge of a firearm in the Yepiz shooting. Kliment asked, "Your understanding is that you are to serve a sentence of eight years; is that right?" Davila responded, "[T]hat's right." Davila then acknowledged that the agreement was really for "boot camp," a "six[-]month program."

¶ 12    Prior to closing arguments, the trial court instructed the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved July 18, 2014), that they could consider any "interest, bias, or prejudice" a witness may have. The jury was also instructed pursuant to Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved October 17, 2014), in that it should consider accomplice testimony with "suspicion" and "caution," and that "[i]t should be carefully examined in light of the other evidence in the case."

¶ 13    During closing argument, Mr. Kliment argued that Ruben Davila knew the details of Nico Contreras' murder because "he was there and he committed [the] crime." Mr. Kliment asked rhetorically, "Why would Davila lie about that now? He is already getting away with two murders. That we know from his agreement. He's getting away with numerous shootings. We know this from his—" The State objected, stating, "[T]here's no evidence as to numerous shootings." Mr. Kliment responded, "He admitted to numerous shootings." The trial court overruled the objection,

noting that Kliment made "a reasonable inference." Mr. Kliment reminded the jury that Davila said that "he did numerous shootings for the mob." Mr. Kliment discussed the benefit Davila got from his agreement with the State, in which he received "$38,000" and "boot camp for the murder of Tony Yepiz." Mr. Kliment argued that Davila hid in Mexico after the shooting and that "[t]he deal that he worked out with the police, all that was worked out, the details, worked out when he was in Mexico." Mr. Kliment argued that, in the deal, Davila was "not being prosecuted for the murder of Tony Yepiz or Nicholas Contreras." Mr. Kliment reminded the jurors that the deal also included "another felony charge being dismissed" along with "a whole bunch of misdemeanor domestics and traffic cases, and DUI's and so forth." Mr. Kliment argued that Davila was not someone who just "grew a conscience and became Saint Ruben Davila." Mr. Kliment continued, stating that Davila "made a deal and the only punishment he'll receive is either an eight-year sentence" or "boot camp, which he thinks is six to eight months." Mr. Kliment reminded jurors that Davila's testimony was subject to suspicion and should be "considered *** with caution." Mr. Kliment argued that Ruben Davila committed the murder and that he was "going to get away with this murder and he's going to get away with Tony Yepiz's murder, and who knows what else." Following closing arguments, the jury returned a general verdict finding defendant guilty of first-degree murder.

¶ 14                                    B. Subsequent Appeals

¶ 15    In *Downs I*, we held that the trial court erred in conducting a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and remanded with directions. In *People v. Downs*, 2014 IL App (2d) 121156 (*Downs II*), we held that the trial court erroneously defined "reasonable doubt" for the jury and reversed and remanded for a new trial. In *People v. Downs*, 2015 IL 117934 (*Downs III*), our supreme court held that the trial court's response to the jury's question asking for a

definition of "reasonable doubt" did not violate the admonition against defining the term. Our supreme court reversed our judgment and remanded for our consideration of defendant's remaining contentions. In *People v. Downs*, 2016 IL App 3d 121156-B (*Downs IV*), we held that *Krankel* counsel abdicated his responsibility to present defendant's nonfrivolous claims of ineffective assistance of trial counsel, which deprived defendant of his right to subject those claims to a proper second-step *Krankel* hearing. We ordered that a new attorney shall be appointed for investigation and presentation of any nonfrivolous claims. Our supreme court, in the exercise of its supervisory authority, directed us to vacate our judgment and consider the effect of *People v. Cherry*, 2016 IL 118728, on the issue of whether *Krankel* counsel's performance was constitutionally adequate under *Strickland v. Washington*, 466 U.S. 668 (1984). In *Cherry*, our supreme court held that a defendant claiming ineffective assistance of appointed counsel in a *Krankel* proceeding must demonstrate both prongs of *Strickland's* test. 2016 IL 118728, ¶¶ 28-33.

¶ 16    In *Downs V*, we vacated our judgment in *Downs* IV and considered the effect of *Cherry*. On defendant's motion, we ordered supplemental briefs on the effect of *Cherry* on our consideration of defendant's claims. *Id.* ¶ 34. We held that *Krankel* counsel provided ineffective assistance by depriving defendant of a proper second-stage *Krankel* hearing, where counsel: (1) did not consult defendant; (2) conducted no investigation of defendant's claims; and (3) argued against defendant's claims. *Id.* ¶¶ 67-79. We directed the trial court to appoint a different attorney. We stated that the new attorney shall be allowed to conduct an investigation of defendant's claims of ineffective assistance of trial counsel and admonished new counsel to present any nonfrivolous claims supported by the record or by his or her independent investigation followed by an adversarial second stage *Krankel* hearing on those claims. We stated that, if the new attorney found no such claims, he or she should follow *People v. Greer*, 212 Ill. 2d 192, 209 (2004), by filing a

motion to withdraw.

¶ 17                                    C. The Instant Appeal

¶ 18    The facts in this case are adequately set forth in *Downs I* and *Downs II*. We will discuss only those facts that are necessary. Following our remand in *Downs V*, the trial court appointed new counsel, Mr. Donald Zuelke, to investigate and present any of defendant's nonfrivolous claims of ineffective assistance of trial counsel. Mr. Zuelke visited and spoke to defendant on several occasions to discuss defendant's claims to be presented in his amended motion for a new trial, specifically claims of ineffective assistance of trial counsel. On August 28, 2019, Mr. Zuelke filed "Defendant's Fourth Amended Motion [f]or a New Trial Based on Ineffective Assistance of Counsel." Mr. Zuelke also filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), despite acknowledging that "this isn't a post conviction." Mr. Zuelke told the trial court that, while he did not believe the certificate was required, he filed it "in the interest of caution, in light of the history of the case." The State commented that the caption on the motion should be "just a posttrial motion," because defendant was now represented by counsel and the parties were "past Mr. Downs doing it by himself." The trial court allowed the filing and gave the State time to respond.

¶ 19    Defendant's motion argued that trial counsel's performance "fell below an objective standard of reasonable representation" during argument on the State's motion *in limine* to prohibit defense counsel from cross-examining Ruben Davila about the details of the murder of Antonio Yepiz. Defendant argued that trial counsel should have argued that "the purpose of questioning Ruben Davila about the murder of Yepiz was not to show he was a bad person or a person of bad character[,] but rather to properly confront him with his interest, bias, and motive regarding his

testimony."[2] Defendant's motion argued that trial counsel's failure to argue "interest, bias, or motive," and his agreement "with the trial court's and the State's erroneous interpretation of the law" caused the defendant to be "denied effective representation."

¶ 20    The State's response to defendant's motion argued that "[t]he agreement [was] always a subject ripe for cross-examination but the details of the prior murder [were] not part of the agreement."

¶ 21    The State maintained that, even if "trial counsel would have argued in the manner the defendant now complains of, the ruling would not have changed as the law is quite clear." The State noted that the "only evidence the State ever had indicating that Davila killed Anthony Yepiz was his own inadmissible statement when he came forward to testify for the State." The State's agreement with Ruben Davila required him to "cooperate fully with the Kane County State's Attorney's Office and the Aurora Police Department in the investigation into the murder of Antonio Yepiz on September 29, 1996."[3] The details of the Yepiz murder are not set forth in the agreement.

¶ 22    On November 8, 2019, the trial court approved the issuance of a subpoena for trial counsel, David Kliment, who since the trial had been appointed to the position of Associate Judge. The trial court found that Judge Kliment's testimony would be necessary at the hearing on defendant's motion for a new trial.

---

[2]Defendant's fourth amended motion contained additional claims, none of which are relevant to this appeal.

[3]The last name is spelled "Zepis" in the agreement, but "Yepiz" throughout the record on appeal.

¶ 23     The hearing on defendant's motion for new trial commenced on December 13, 2019. Defendant was sworn and signed the affidavit that was attached to the motion for new trial. Mr. Zuelke filed an amended certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), specifically listing the personal visits he had with defendant.[4]  Mr. Zuelke stated that, although he was not required to file a Rule 651(c) certificate, he did so because of the "history so it's clear that [he] had a lot of contact with Mr. Downs."

¶ 24     The trial court allowed the State to call Judge Kliment out of order. Judge Kliment testified that, at the time of defendant's trial, he was the Kane County Public Defender. Before becoming the Public Defender, Judge Kliment had been in private practice for nine years, doing mostly criminal defense as well as some civil work. Kliment had tried hundreds of cases including approximately fifty murder cases. Kliment testified that he tried several capital murders and was part of the initial group of the "capital litigation bar." Kliment testified that, prior to trial, he reviewed all of the discovery in the case, conducted an investigation into the possible defenses, spoke to potential witnesses, and spoke to defendant "multiple times and discussed many different possible strategies." Kliment stated that, "[b]y the time [they] went to trial, [they] had one strategy; and [that he] had talked to [defendant] about it prior to the time of going to trial."

¶ 25     Kliment testified that he had "very little independent recollection" of his cross-examination of Ruben Davila. He did recall that, prior to trial, the State filed a motion *in limine* regarding the cross-examination of Davila as it related to the murder of "Tony Yepiz." Kliment had read the transcript of "all or a portion of that hearing," which Mr. Zuelke had attached to his motion.

---

[4]Mr. Zuelke filed additional exhibits related to his alibi claim that is not relevant to this appeal.

Kliment recalled that he had argued "stridently" against the State's motion, but in the end, Judge Sheldon ruled against "using specific act impeachment" to impeach Ruben Davila. Kliment acknowledged that he was aware that, at the time, specific act impeachment was not allowed in Illinois and that is still the case. Kliment stated that he was "trying to get [the details of the Yepiz murder] admitted so [he] could show the jury what type of person Ruben Davila was." The State then asked, "And as part of your, I will call it attempted impeachment of him on this issue, it would have gone to his bias and intent?" Kliment answered, "Correct." Kliment recalled that a large part of his cross-examination of Davila related to his agreement to testify for the State. Kliment used his "years of experience in evaluating each and every aspect" of the trial and "did the best job" he was "capable of doing."

¶ 26    On cross-examination, Kliment acknowledged that the majority of his conversations with defendant took place on court dates "in the lockup." Kliment testified that he "tried very hard" to convince Judge Sheldon to allow him to cross-examine Davila on the details of the Yepiz murder. Initially, Judge Sheldon ruled that "it was a collateral matter," but then there was "some change in that order" based on "one off-the-record conference." Kliment identified the typewritten agreement Davila made with the State and agreed that "it talk[ed] about [how] he [was] going to plead guilty to aggravated discharge of a firearm. No details [were] given." Kliment stated that he wanted to cross-examine Davila on the details to show the jury what kind of person the State was relying on. Kliment recalled that, after a conference with Judge Sheldon, he was allowed on re-cross to "bring out some more points about Davila's involvement with Yepiz." Kliment said he was trying to push the limits on cross-examination and felt that it was "adequate" given the parameters. He did what he was "able to do." Kliment acknowledged that part of Davila's agreement was that he was supposed to give a statement to the police "about specifics" of the

Yepiz murder. Kliment agreed that the main evidence against defendant was the testimony of Davila.

¶ 27    On February 21, 2020, the hearing on defendant's motion for new trial continued. The live testimony of the witnesses called, with the exception of defendant, are not relevant to the issues in this appeal. Defendant testified that, during the trial testimony of Ruben Davila, there was "an agreement made in chambers" which he was not present for. Defendant testified that, during the pre-trial period in the instant case, he was serving a sentence in the Illinois Department of Corrections on an unrelated case at Big Muddy River Correctional Center. He was "writted" back and forth and then "remanded only for trial." On court dates, Kliment would visit with defendant in lock-up. Defendant did not recall if Kliment came to see him in the Kane County jail. Defendant said his conversations with Kliment were brief, but he never had a "full discussion" about his alibi. Defendant testified that he spoke to Kliment about the interview of Ruben Davila by law enforcement when Davila was in "Porto Vallarta."

¶ 28    On cross-examination, defendant acknowledged that, after he told Kliment about his alibi, Kliment told him he had investigated the proposed alibi and that "he could not find anything" about him being at work at the time of the murder. Kliment told him that he had contacted "the main headquarters in Michigan and talked to attorneys there. And they just had no records of seasonal employees at that time."[5] On cross-examination, defendant testified that, ten days after the murder of Nico Contreras, he was questioned by the Aurora Police Department, and that he told them he was "out partying with Ruben Davila that night." Defendant said Ruben Davila told

---

[5]Defendant's proposed alibi was that he was at work at BorgWarner in West Chicago the night of the Contreras murder with his brother, and that his sister drove them to work.

him to say they were "out with [their] wives or girlfriends" and that he told "Detective Sauer [that] Ruben Davila told [him] to say that." The State asked, "So ten days after the murder occurred when you were being questioned by the Aurora Police Department as a suspect in this murder, you did not tell them [you were] at work, correct?" Defendant responded, "They never told me I was a suspect in any murder." Defendant acknowledged that, in 2004, he was convicted of attempt first-degree murder and was serving a 17-year sentence on that case.

¶ 29    The defense rested. The State had no additional witnesses and no rebuttal. During argument, Mr. Zuelke noted that his role was "not to present a complete motion for new trial" because that had already been "heard and denied," but to primarily raise the issue of "ineffective assistance." Mr. Zuelke argued that defendant's trial attorney "misunderstood the law" and that, given the importance of Davila's testimony, "the facts of that murder [were] crucial to show the jury the magnitude of the benefit that he was receiving by not being charged in that murder." Zuelke acknowledged that "it was mentioned ever so briefly that he didn't get charged" with the Yepiz murder. Zuelke argued that the facts would have shown that "they basically set the guy up," that they took Yepiz somewhere under "false pretenses for the purpose of killing him," and because "Diaz told him I have a mission for you," he fulfilled his role in that mission. Mr. Zuelke summarized the statement Davila had given to the police in which he admitted luring Yepiz out of a vehicle, shooting him in the back of the head, and then shooting him three more times in the back of the head after he "was laying on the ground probably dead." Mr. Zuelke stated that "[t]his was done basically as a gang hit." Zuelke argued that the agreement only touched on the Yepiz murder, and that it did not convey "the magnitude of the benefit" Davila was receiving for "a brutal, cold-blooded, premeditated, cowardly murder." Zuelke then asked, "So when Judge Sheldon made the ruling based on the State's argument that it was a collateral matter, how can that possibly be a

collateral matter, your honor?" The trial court responded by asking, "Isn't that an argument against the trial court's decision, not strategy?" The court also asked, "Why is that ineffective" as opposed to "an argument against the court's decision as the Court rendering error?" Mr. Zuelke responded, "It is absolutely an argument against the court's decision, your Honor." Zuelke argued that trial counsel never argued "to Davila's bias, [or] to his motive to testify because of the unbelievably good deal." Mr. Zuelke, in commenting on Kliment's argument that the law is wrong, stated, "I realized I'm not allowed to get into this[,] but the law is wrong. If you, your honor, Judge Sheldon would allow me to get into this, maybe we can change the law." The trial court then referred Mr. Zuelke to Kliment's argument to the trial court on the State's motion *in limine* that showed "he wanted to get into the facts to show that this was a lenient deal." Zuelke agreed that Kliment mentioned "a deal in passing" but, according to Zuelke, "the whole gist of his argument" was to show "bad character." The trial court then referred to defendant's motion for new trial, which quoted Kliment's argument that, because of the trial court's rulings on the motion *in limine*, the "jury [would] never know" that Davila committed first degree murder because, according to the court's ruling, he couldn't "question him beyond the four corners of [the agreement]." Defendant's motion quotes Judge Sheldon's response, which was, "I'm telling you what our courts say. And I'm telling you that I am duty bound to follow what they say." The trial court stated that all Kliment was trying to do was impeach Davila as to his deal while Judge Sheldon refused to let him argue "it was first degree murder reduced down from aggravated battery." The court noted that it appeared "that there were two arguments." Specifically, it stated, "One, which would be a very valid argument, is I want to impeach on the deal and I think I've read that. The other argument that seems to be abandoned pretty quickly, because I happen to agree, is that you can't get into character evidence on specific crimes acts in Illinois. Maybe the trial court confused the two." The court

stated that it did not appear that Kliment abandoned the "argument of I want to get a deal. Attorney Kliment simply listened to the court at trial and did not violate the Court's order."

¶ 30    Mr. Zuelke responded to the court's comments saying that he believed both Kliment and the trial judge "missed the boat." He stated that "[t]here was nothing about the deal. It was all about bad character." Mr. Zuelke argued that the issue was not properly preserved in a posttrial motion. The court noted that Kliment's posttrial motion argued that the trial "court erred in granting the People's motion *in limine* concerning Davila from effectively questioning Davila, depriving [defendant] the right of cross examination." During the exchange, Mr. Zuelke conceded that "Mr. Downs['] trial attorney made a very strong argument." He continued, "He did a very thorough job in this trial in many ways. He's obviously an excellent attorney."

¶ 31    The parties agreed that, based on our mandate in *Downs V*, the issue to be addressed was whether trial counsel's performance was ineffective. The State argued that Kliment's testimony was very credible and that he had a reason for each decision he made. The State noted that it "had zero evidence that Ruben Davila participated in [Contreras'] murder other than his [s]tatement." The same was true with respect to the Yepiz murder. Davila "testified and then the deal was put in." The State argued that the "[b]ias against Ruben Davila is that he could have been charged with the murder." The State agreed that "it [had] nothing to do with the specific act because once again that goes back to character." The State argued that the "deal" Davlia got was not incredibly lenient because Davila provided the "only evidence [the State] had against him." The State noted that it was the State that requested a break at the end of the State's redirect examination of Davila in order to allow "recross [examination] specifically about the deal."

¶ 32    The trial court gave the parties leave to supplement their arguments and continued the case. The court advised the parties that it was "going to re-read some portions of the trial transcript in

this case" and took the case "under advisement."

¶ 33    On March 16, 2020, the trial court allowed defendant to reopen the proofs to present evidence to corroborate his alibi with documents showing that he was employed at BorgWarner at the time of the Contreras murder. The documents had recently been found by defendant's daughter in her grandmother's house. Mr. Zuelke conceded that "Mr. Kliment wouldn't have had access to those documents." The trial court took a brief recess to "take a look at the pay stubs."

¶ 34    Prior to ruling, the trial court outlined the materials it had reviewed, which included the trial transcripts and the testimony of Mr. Daniel Kliment taken during the hearing on defendant's fourth amended motion for new trial. The court ruled as follows:

> "Paragraph 4 generally states that [defendant] was denied ineffective representation by the failure of his trial attorney to properly argue against the State's motion *in limine* to exclude any questions of Ruben Davila about the murder of Mr. Yepiz.
>
> In this case, it appears defense counsel for Mr. Downs wanted to get into not only the agreement Mr. Davila had with the State, but also the facts of the murder listed above. There's no question in this Court's mind that Defense counsel argued vigorously to be allowed to get into the facts. The court denied Defense counsel this opportunity.
>
> Defense counsel argued that he wanted to the get [*sic*] into the motive of witness and the character of the witness. Although Mr. Downs' current counsel takes issue with the character evidence, stating that trial counsel was ineffective for arguing about character, I believe Mr. Downs' current counsel is being somewhat hyper[ ]technical.
>
> This Court agrees a specific act impeachment is not allowed. In this case the trial court allowed Defense counsel to bring up the deal Mr. Davila had cut but not the actual facts of the case.

In reading the transcripts and listening to the testimony of trial counsel, it is the Court's opinion that counsel was attempting to impeach Mr. Davila by showing that he received a lenient deal. Trial counsel followed the court's orders.

It is this Court's opinion that trial counsel argued appropriately to get into all the issues of Mr. Davila. It should also be noted that after Mr. Davila testified, the State seemed to request the court to allow trial counsel to get into more facts concerning the murder of Mr. Yepiz and more facts of the deal Mr. Davila cut in relation to Niko's murder and the above-mentioned murder.

Trial counsel argued vigorously on behalf of his client. He may have used the word, [']character,['] but that went to the general outlook of this case as to what the gentleman had done and the deal he received. Trial counsel followed the court's orders, continued to argue vigorously on behalf of his client, and was somewhat successful on recross-examination on getting the court to allow more questions concerning the deal cut by Mr. Davila.

At no more time did trial counsel's argument in relation to the State's motion *in limine* fall below an objective standard of reasonable representation. And, therefore, this argument fails and is denied by this Court."

¶ 35 The trial court found that, with respect to all of defendant's claims, "trial counsel's performance was effective and not deficient" and denied defendant's motion "in the entirety." Defendant timely appeals.

¶ 36                                    II. ANALYSIS

¶ 37 Defendant argues that his constitutional right to effective assistance of counsel was denied because trial counsel "failed to argue the defense should be permitted to cross-examine the State's

primary witness, Ruben Davila, to show Davila's motive and bias by questioning Davila about details of a murder for which he was permitted to plead guilty to a lesser charge as part of a cooperation agreement with the State," rather than to "cross-examine Davila about the murder to illustrate Davila's character, which counsel acknowledged is not a proper basis for impeachment."

¶ 38     The State argues that trial counsel's performance was not objectively unreasonable for failing to argue that the details of the Yepiz murder should have been admitted to show Davila's bias and motive to testify falsely because those details were properly excluded by the trial court. Alternatively, the State argues that defendant's argument merely speculates, without legal support, that the details of the Yepiz murder would have been admissible as motive and bias. The State also argues that, even if the details were admitted, defendant has not shown a reasonable probability that the outcome of his trial would have been different, because the jury was aware that Davila confessed to murdering Yepiz and was not being charged with his murder.

¶ 39     The parties disagree over the proper standard of review. In his opening brief, defendant cites *People v.* Hale, 2013 IL 113140, ¶ 15, and *People v. Westmoreland*, 2013 IL App (2d) 120082, ¶ 27, to argue that "ineffective assistance of counsel claims present a mixed question of fact and law," and that "[r]eviewing courts defer to a trial court's finding of fact, but review *de novo* the ultimate legal issue of whether a defendant's constitutional right to effective assistance of counsel has been violated." Citing *People v. Jackson*, 2020 IL 124112, ¶ 98, and *People v. Russell*, 2021 IL App (2d) 180874, ¶ 68, the State argues that where, as here, the trial court has conducted a *Krankel* hearing and ruled on the merits of a defendant's claims of ineffective assistance of counsel, a reviewing court will disturb the trial court's decision only if it is manifestly erroneous. In *Jackson*, our supreme court stated that "the standard of review depends on whether the trial court did or did not determine the merits of the defendant's *pro se* potential claims of

ineffective assistance of counsel." 2020 IL 124112, ¶ 98. In *Russell*, we rejected the defendant's argument that we apply "a mixed standard of review—deferential for the trial court's factual findings and *de novo* on the ultimate question of the adequacy of counsel's performance." 2021 IL App (2d) 180874, ¶ 68. In his reply brief, defendant cites *Hale*, 2013 IL 113140, ¶ 15, in arguing that the "results of those evidentiary hearings on ineffective assistance of counsel claims should be reviewed *de novo*." In *Hale*, our supreme court stated that, "[i]n general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *Id.*, ¶ 15. There, the defendant argued that his rejection of a proffered plea was based upon defense counsel's erroneous advice. *Id.* ¶ 18. The circuit court rejected defendant's claim following an evidentiary hearing. *Id.* ¶ 13. The appellate court reversed, applying a mixed standard of review. *Id.* ¶¶ 13, 15. In reversing the appellate court, our supreme court applied the "manifest weight of the evidence standard" to the "circuit court's credibility determination." *Id.* ¶ 24.

¶ 40 We agree with the State that the manifestly-erroneous standard applies in this case. The trial court reached a "determination on the merits" of defendant's claim that trial counsel was ineffective for failing to argue bias and motive in response to the State's motion *in limine* to prohibit cross-examination of Davila on the details of the Yepiz murder. *Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 41 Ineffective assistance of counsel claims are judged under the familiar standard set forth in *Strickland*, 466 U.S. 668. "In order to establish ineffective assistance of counsel, a defendant must first demonstrate that his defense counsel's performance was deficient in that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998) (quoting *Strickland*, 466 U.S. at 687). "In doing so, a defendant must overcome the strong presumption that the challenged action

or inaction was the product of sound trial strategy and not of incompetence." *Id.* (citing *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Second, "a defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). When assessing the performance prong of *Strickland*, "a court must show great deference to counsel's strategic decisions, making every effort to eliminate the distorting effects of hindsight and evaluate the conduct from counsel's perspective at the time." *People v. Massey*, 2019 IL App (1st) 162407, ¶ 25.

¶ 42    Defendant's argument is grounded in the fundamental right to confront witnesses against him, which includes the right to cross-examination. *People v. Kliner*, 185 Ill. 2d 81, 130 (1998) (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *People v. Triplett*, 108 Ill. 2d 463, 464 (1985)). "Any *permissible* matter which affects the witness's credibility may be developed on cross-examination." *Id.* (Emphasis added.)

¶ 43    The right to confrontation under the sixth amendment "includes the right to cross-examine a witness regarding the witness' biases, interests, or motive to testify." *People v. Bull*, 185 Ill. 2d 179, 206 (1998). A witness may be impeached by attacking his or her character. *Id.* "Only criminal convictions may be used; proof of arrests or other charges are inadmissible." *Id.* Another accepted method of impeachment is to show that a witness has a "bias, interest, or motive" to testify falsely. *Id.* With this method, a defendant may inquire into the fact that the witness "has been arrested or otherwise charged with a crime where it would reasonably tend to show that the witness' testimony might be influenced by interest, bias, or a motive to testify falsely." *Id.* (citing *People v. Lucas*, 151 Ill. 2d 461, 491-92 (1992); *Triplett*, 108 Ill. 2d at 475).

¶ 44    In this case, the State conceded in its motion *in limine* that "the deal reached between the State and the witness Davila is a relevant area of cross examination as it relates to the Yepiz murder

and Davila's involvement with the killing[,] and the defendant should be allowed to pursue that issue on cross-examination, however the details of the murder would not be relevant." Defendant argues, without citation to authority, that the details of the Yepiz murder would have been admissible as bias or motive had trial counsel argued this alternative instead of focusing on character. Ordinarily, failure to cite relevant authority for a defendant's contentions of error results in forfeiture of the argument. *People v. Pope*, 2020 IL App (4th) 180773, ¶ 77 (citing Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020)). While the State points out in its brief that defendant's argument is "without any legal support," the State does not argue that the argument is forfeited. Therefore, we will consider defendant's argument.

¶ 45    The right to cross-examination is not subject to the court's discretion. Because the exposure of "a witness' motivation in testifying is a proper and important function of the constitutionally protected right of the cross-examination, the widest latitude should be given to the defense on cross-examination when trying to establish a witness' bias or motive." *People v. Nutall*, 312 Ill. App. 3d 620, 626 (2000) (quoting *People v. Ramey*, 152 Ill. 2d 41, 67 (1992)). While the fact that a witness has been arrested or charged with an offense or is testifying in exchange for promises from the State may be inquired into on cross-examination to demonstrate bias or motive to testify falsely, our research has found no authority for the proposition that a defendant has a right to explore the underlying details of an otherwise unrelated offense. In *People v. Collins*, 366 Ill. App. 3d 885, 889 (2006), during cross-examination of the victim, the defense attempted to inquire into the underlying facts of a battery charge that had been "stricken with leave to reinstate prior to defendant's trial." The State objected to "getting into the facts of this case," stating its belief that the victim had "a Fifth Amendment right." *Id.* On appeal, the First District concluded that the witness' battery arrest that "had been stricken with leave to reinstate was relevant to show his

potential interest, bias, or motive to testify," as this could cause one to infer that the witness "had motive to testify favorably for the State." *Id.* at 893 (citing *Triplett*, 108 Ill. 2d at 475.) The court concluded that Collins' confrontation rights were not violated because "[t]he facts underlying what actually occurred during the alleged battery, however, are not relevant to show his potential biases or motives for testifying." *Id.* Defendant cites no authority for his argument that the details of the Yepiz murder were necessary in order for the jury to assess Davila's bias and motive to testify falsely.

¶ 46    In *People v. Cruz*, 162 Ill. 2d 314, 321 (1994), the State called a jail-house witness to testify regarding statements the defendant had made to him while housed together in the Du Page County jail. Prior to trial, the trial court granted the State's motion *in limine* to prevent the defense from cross-examining the witness as to the details of his offenses, which involved "theft of human body parts, including genitalia." *Id.* at 327. The trial court granted the motion. *Id.* at 377. Evidence of the witness' convictions and psychiatric treatment were admitted, but the details were excluded. *Id.* at 327. On appeal, the defendant argued that the exclusion of the details of the witness' offenses deprived him of his right to "meaningfully impeach" the witness and "therefore his constitutional right to confront witnesses against him was abridged." *Id.* at 376. Our supreme court stated that, "absent an abuse of discretion, which results in manifest prejudice to the defendant, the ruling will not be overturned on review." *Id.* at 377. The court stated that the basis for placing limits on the scope of cross-examination "is the avoidance of collateral and extraneous issues." *Id.* The court also rejected the defendant's argument that the witness' statement on cross-examination that he was "perfectly normal" opened the door to "evidence concerning the details of his convictions." *Id.* at 378. Our supreme court stated that "[it had] found no abuse of discretion where either the jury was informed of a witness' prior convictions and any *benefits received for testifying* [citation]*,*

or was in the position following testimony and probing cross-examination to judge the witness' demeanor and credibility." *Id.* (Emphasis added.)

¶ 47 We agree with the State that defendant "seeks to avoid the abuse of discretion standard," which governs the trial court's ruling on the scope of cross-examination, by arguing that Mr. Kliment was ineffective for failing to argue bias and motive as an alternative basis for admission of the details of the Yepiz murder. In ruling on defendant's fourth amended motion for new trial, the trial court found that "[d]efense counsel argued that he wanted to get *into the motive* and the character of the witness." (Emphasis added.) The trial court believed Mr. Zuelke was "being somewhat hyper[ ]technical." We agree with the trial court. It is clear from the trial record that the trial judge understood Kliment's argument to encompass both character as well as bias and motive. After the trial judge had ruled, Mr. Kliment continued to argue that it was important for the jury to know that the Yepiz shooting resulted in a murder. He argued, "So, the jury will never know that cause [*sic*] you're telling me I can't question beyond the corners of this document." Kliment argued that, by "completely" excluding the fact that it was a murder, "[t]hey're painting him up there to be a do-gooder at this point, which is not true." The trial court judge was under the mistaken belief that only the charge to which Davila agreed to plead guilty was admissible and not the charge he avoided by agreeing to testify. The State corrected this error by agreeing to allow re-cross-examination so the jury would know Davila avoided being charged with murder. "[The] right to cross-examine a witness about a pending charge against him to show bias cannot be defeated merely because there is other evidence that the witness is biased; nor can it be defeated by a claim of lack of prejudice." *People v. Kellas*, 72 Ill. App. 3d 445, 454 (1979).

¶ 48 We note that nowhere in our supreme court precedents has the court stated that the defense should be allowed to prove the underlying facts of a witness' pending but unrelated charge in order

to show bias or motive to testify falsely. For example, nowhere in *Triplett* does the court say that the details of an arrest or charge must (or may) be allowed to be investigated on cross-examination. 108 Ill. 2d 463. Likewise, in *People v. Wilkerson*, 87 Ill 2d 151, 156 (1981), the court stated that "[t]he defendants should have been permitted on cross-examination to develop matters that would reasonably show the bias, motive, and willingness of the State's witnesses to testify."

¶ 49    We further note that, on cross-examination, Mr. Kliment got Davila to confess that, in addition to participating in the murder of Nico Contreras and the murder of Antonio Yepiz, he committed up to ten or more "shootings for the mob." While the details of the Yepiz murder are despicable, they do not add anything to Davila's bias or motive. The jury was provided with more than sufficient information to fully assess Davila's credibility.

¶ 50    Finally, it "must be borne in mind that counsel's performance must be evaluated on the basis of the entire record, and not upon isolated instances of alleged incompetence called into question by the defendant." *People v. Flores*, 128 Ill. 2d 66, 107 (1989). Based upon our review of the trial record, we hold that the trial court's finding that defendant failed to establish deficient performance was not manifestly erroneous.

¶ 51                                III. CONCLUSION

¶ 52    For the reasons stated, the trial court did not manifestly err in finding that defendant failed to establish ineffective assistance of trial counsel.

¶ 53    Affirmed.