FILREP, S. A., Plaintiff-Appellee, *v.* FRANCIS BARRY, Defendant-Appellant.

Third District   No. 79-800

Opinion filed September 19, 1980.

White & Marsh, of Ottawa, for appellant.

Richard P. Lamoreaux and Stephen Landuyt, both of Monmouth (Ralph Perlberger, of counsel), for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

This appeal is taken by the defendant, Francis Barry, from a judgment in the amount of $53,000 plus interest from May 1, 1975, at the rate of 8% per annum, being $13,768 and costs in the amount of $55.80, totaling $66,823,80, entered against him and in favor of the plaintiff, Filrep, S.A., a Swiss corporation, by the Circuit Court of Mercer County. The action was brought to recover the balance of monies allegedly due to the plaintiff upon a contract of sale of certain Simmental cattle to the defendant.

The following issues are presented in this appeal: whether it was improper for the trial judge to take judicial notice of the contents of a record in an earlier proceeding in the same court, which was presided over by another judge and in which the defendant in the instant case was the plaintiff; whether the judgment is against the manifest weight of the evidence; and whether interest was properly assessed against the defendant.

Defendant Barry commenced negotiations with the plaintiff in the early spring of 1974 for the purchase by the defendant of certain Simmental cattle from the plaintiff. The parties met in Ireland in June 1974, where the defendant examined specimen animals, both cows and bulls.

According to the defendant's testimony, an oral agreement was reached by the parties while in Ireland to the effect that the defendant would purchase 11 specified Fleckview cows for $20,000 apiece and five specified Simmental bulls from a particular lot for $15,000 apiece. He further testified that it was agreed that the females were to be shipped

from Ireland to the United States with an unconditional guarantee of their fertility. In addition the parties agreed that the females were to leave Ireland all open, which meant that none of the females would have been bred before they left Ireland.

A down-payment was made by the defendant before leaving Ireland, but no written contract was signed by either party. Upon his return to the United States, the defendant received two written contracts from the plaintiff, one for the sale of the female cattle, the other for the bulls. One of these had been signed by the plaintiff, but neither was ever signed by the defendant or returned to the plaintiff.

■■ Upon these facts alone, it is clear that the only contract between the parties, ratified by subsequent actions, consisted of the oral agreement reached in Ireland. The plaintiff's reliance on provisions in the written contracts which altered or modified the oral agreement are misplaced. Because those instruments were not properly executed, they are without legal effect to bind the parties.

Thirteen head of cattle were shipped to the defendant: 10 females rather than the 11 contracted for because one failed to pass certain importation tests; three bulls rather than the five contracted for, the plaintiff claiming that the two bulls were not sent because they failed the importation tests, the defendant agreeing that one bull failed the test but alleging that the remaining bull was not shipped because it was of superior quality. The reasons for the defendant's assertions are not clear from his testimony, but it appears he charges the plaintiff with knowledge that one of the two bulls not shipped was more valuable than all of the other bulls shipped and hence was worth a great deal more than the $15,000 contract price. The plaintiff denies that any one of the five bulls originally scheduled to be shipped was worth more than the others.

Based on the number of cattle shipped and the price agreed on by the parties in their oral contract, the plaintiff alleged in its complaint that the defendant owed $53,000, computed as follows:

| | | |
|---|---|---|
| 10 females @ $20,000 each | = | $200,000 |
| 3 bulls @ $15,000 each | = | $ 45,000 |
| Total contract price | = | $245,000 |
| Paid by defendant | = | $172,000 |
| Due on contract | = | $ 73,000 |
| Less credit for allegedly sterile cow (Etchen's Karina) | = | -$ 20,000 |
| Amount owed by defendant on contract | = | $. 53,000 |

At trial the defendant alleged that the female known as Etchen's Emerald was found to be with calf upon delivery. He further testified that

he notified the plaintiff of this fact by mailgram. The plaintiff denies receiving this mailgram, pointing out that it was addressed to "Mr. Beaurenaux [*sic*] or Mr. Finet, Paris, (France)", an address insufficient to guarantee delivery. (Mr. Beaurenaut is the general manager of plaintiff Filrep S.A. and Mr. Finet is associated with him in the corporation.) According to the defendant's testimony, Etchen's Emerald was subsequently slaughtered for the going market value of approximately $250, since the early pregnancy had prevented her growth and thus diminished her utility as a breeding stock animal.

The defendant further testified that two of the cows received, Etchen's Karina and Etchen's Leona, were found to be sterile upon examination by Dr. Scott, a veterinarian. The defendant testified that he informed the plaintiff of this fact by telephone and acknowledges that he received a telegram from the plaintiff in reply, requesting that he send nonbreeder certificates for the two infertile cows. According to the defendant's testimony the necessity of supplying a nonbreeder certificate was not a part of the oral agreement reached between the parties, although the written contracts submitted to the defendant contained such a provision.

The defendant claimed that nonbreeder certificates were obtained and sent to the plaintiff, but he was unable to offer any evidence in support of this claim. The plaintiff denied receiving any nonbreeder certificates. Both parties agreed, however, that a credit of $20,000 was given to the defendant on the contract price for Etchen's Karina. The defendant further testified that both of the infertile cows were slaughtered and that he received approximately $250 for each cow.

Following the noon recess, held at the conclusion of the defendant's testimony the trial judge advised the parties and their respective counsel that he had taken judicial notice of an earlier case tried in Mercer County by Judge McNeal which also involved Simmental cattle. The case had been brought to the judge's attention during lunch time conversations among the judges.

The trial judge explained that he decided to look into the file as a matter of curiosity. Upon doing so, he discovered that the defendant in the case at bar had been the plaintiff on the earlier case and that, through admission of fact made pursuant to Supreme Court Rule 216 in the earlier case, the defendant had apparently committed perjury in the instant case. Specifically, the defendant in the present case testified that three of the female cattle imported were slaughtered in 1975, namely Etchen's Emerald, Etchen's Karina, and Etchen's Leona, but facts admitted in the earlier case showed that these three cows were alive in 1976. They had been transferred in 1975 to a breeding farm called Omega Ranch in

Dixon, Texas, where Etchen's Leona, one of the allegedly infertile cows, had since given birth to at least four calves.

The trial judge commented on his findings as follows: "I don't like to see perjury in this court, and that is what my impression is of what I have heard to this time." A recess was held to allow the attorneys to examine the record from the earlier case, the pertinent pages of which had been marked with paperclips.

Following the recess, the defendant's attorney moved for the trial judge to recuse himself, but this motion was denied. Further testimony was given and, at the close of all the evidence, the defendant moved for a mistrial. This motion was denied as was the defendant's motion to vacate the judgment entered for the plaintiff in the amount of $66,823.80.

On appeal the defendant contends that reversible error was committed by the trial judge when he took judicial notice of the record in the earlier case. The traditional rule has been that a court is not bound to, and ordinarily will not take, judicial notice of the proceedings or record in another cause, whether such cause was tried in the same court or in another court, although it may do so where otherwise injustice will result. (1 Jones on Evidence §2:29 (6th ed. 1972); 29 Am. Jur. 2d *Evidence* §58 (1969).) Early Illinois cases adhered to this traditional rule, precluding a judge from taking judicial notice of the orders or decrees entered in other cases in the court in which he presides. (*People v. McKinlay* (1937), 367 Ill. 504, 507, 11 N.E.2d 933, 935; *People ex rel. Winkler v. Chicago & Eastern Illinois Ry. Co.* (1929), 336 Ill. 506, 510, 168 N.E.2d 294, 296; *People ex rel. Zilm v. Carr* (1914), 265 Ill. 220, 229, 106 N.E. 801, 804; *Streeter v. Streeter* (1867), 43 Ill. 155, 164.) Likewise, it was held repeatedly that proof of prior convictions should be by means of certified copies of the record and identification of the defendant in the prior case as the same person. *People v. Madison* (1974), 56 Ill. 2d 476, 488, 309 N.E.2d 11, 17-18; *People v. McCrimmon* (1967), 37 Ill. 2d 40, 45, 224 N.E.2d 822, 825.

However, in 1976, the Illinois Supreme Court handed down the case of *People v. Davis* (1976), 65 Ill. 2d 157, 357 N.E.2d 792, in which the court after reviewing relevant Illinois cases both criminal and civil, expressed a more flexible approach to the question of judicial notice. In *Davis*, the court held that a judge presiding at a probation revocation hearing, who also presided when the defendant had pleaded guilty to another criminal charge, may take judicial notice of the prior conviction where there is no denial that the conviction occurred or that the defendant was actually the person convicted, and where the judge is presented with documents sufficient to satisfy him of the fact of the prior conviction.

In reaching its decision, the court in *Davis* rejected the State's contention that subdivision (b) of Federal Rule of Evidence 201 be

adopted, preferring to await the report of the court's committee on evidence which is considering a new code of evidence for Illinois. Subdivision (b) of Federal Rule 201 calls for the judicial notice of adjudicative facts which, while not generally known, are readily verifiable from sources of indisputable accuracy. Although the court elected to merely decide the case before them, the reasoning and ultimate disposition of the issue reflect a predisposition to adhere to Federal Rule 201, as is evident from the following:

> "In McCormick on Evidence, section 330, at 766 (2d ed. 1972), it is said to be 'settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to matters occurring in the immediate trial, and in previous trials or hearings. *The principle seemingly is equally applicable to matters of record in the proceedings in other cases in the same court, and some decisions have recognized this, but many courts still adhere to the needless requirement of formal proof, rather than informal presentation, of recorded proceedings in other suits in the same court.*' (Emphasis added.) Taking judicial notice of matters of record in other cases in the same court is simply an application of the increasingly recognized principle that matters susceptible of judicial notice include facts 'capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy.' McCormick, at 763 (2d ed. 1972); see also 9 Wigmore, Evidence, sec. 2571, at 548 (3d ed. 1940); 1 Jones, Evidence, sec. 2.2, at 32 (6th ed. 1972); Rule 9(2)(d), Uniform Rules of Evidence; 4 Jones, Evidence 372 (6th ed. 1972).

* * *

Our recent opinion in *Walsh v. Union Oil Co.* (1972), 53 Ill. 2d 295, 299, has made clear that a court may take judicial notice of other proceedings in other courts, at least where those proceedings involved the same parties and are determinative of the cause *sub judice.* We also note that several of our appellate court judges have recently demonstrated a more flexible approach to this question. (*People v. Dye* (1974), 23 Ill. App. 3d 453, 455-56; *People v. Turner* (1976), 35 Ill. App. 3d 550, 566.) And illustrative of the cases in which the Federal courts, prior to the adoption of Rule 201, had judicially noticed the proceedings in other cases in the same court are *Insurance Company of North America v. National Steel Service Center, Inc.* (N.D. W.Va. 1975), 391 F. Supp. 512, 518, and *Alexander v. Texas Co.* (W.D. La. 1958), 165 F. Supp. 53, 58. In our judgment, the extension of the doctrine of judicial notice to include facts which, while not generally known, are readily verifiable from sources of indisputable accuracy is an important aid in the efficient

disposition of litigation, and its use, where appropriate, is to be commended.

❉ ❉ ❉

In our opinion the prior conviction of defendant in this case falls squarely within the judicially noticeable category of facts 'capable of immediate and accurate demonstration by resort, to easily accessible sources of indisputable accuracy.' " (*People v. Davis* (1976), 65 Ill. 2d 157, 161, 164-65, 357 N.E.2d 792, 794, 796.)

Further evidence of our supreme court's more flexible attitude toward judicial notice is seen in the recent case of *In re W.S.* (1980), 81 Ill. 2d 252, 408 N.E.2d 718, in which the court held that judicial notice may be taken of the corporate existence of a theft victim in a probation revocation hearing.

■■ Based on the reasoning of our supreme court in *Davis* and *In re W. S.*, we hold that the trial judge in the case at bar properly took judicial notice of the facts in the earlier case which indicated that the defendant here had committed perjury. These facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy. In fact, the trial judge brought those sources to the courtroom in the form of the record from the earlier case.

■■ The defendant next contends that the trial judge's findings and judgment are against the manifest weight of the evidence. We find this contention without merit. A trial court's findings of fact when sitting without a jury will not be disturbed unless manifestly against the weight of the evidence. (*McGann v. Murry* (1979), 75 Ill. App. 3d 697, 393 N.E.2d 1339; *General Casualty Co. v. Elam* (1972), 8 Ill. App. 3d 215, 289 N.E.2d 699.) In the present case, the defendant did not dispute the fact that money was still due and owing on the contract; rather he attempted to show that any further payments should be excused because two of the cows were allegedly infertile and one was pregnant upon arrival. The subsequent evidence of perjury on the part of the defendant, shown by the judicially noticed facts from the earlier proceeding, renders meaningless the defendant's excuses for not paying the remainder due on the contract. Furthermore, the defendant was, in fact, granted a $20,000 credit for Etchen's Karina, one of the allegedly infertile cows who was slaughtered in 1975 but who apparently "revived" in 1976. This evidence substantially supports the judge's decision.

■■ The defendant's final argument concerns the interest assessed against him. He first contends that no interest should have been allowed, since there was no express agreement between the parties concerning the payment of interest. However, as the plaintiff argues, in the absence of an express agreement, interest may be assessed by statute as compensation for the withholding of money by an unreasonable and vexatious delay of

payment. (Ill. Rev. Stat. 1979, ch. 74, par. 2.) Something more than mere delay must be present to bring a case within this rule. We find that the defendant's failure to pay in the present case was certainly attributable to something more than mere delay. He unreasonably and vexatiously withheld payment from the plaintiff while claiming there were defects in the cattle when he knew the money rightfully should have been paid.

Lastly, the defendant contends that any interest assessed should have been computed at 5 percent rather than the 8 percent figure actually used. We agree. The statutory provision calling for the payment of interest as compensation for money wrongfully withheld calls for interest to be computed at the rate of 5 percent per annum. Accordingly, we remand this cause to the trial court for recomputation of the interest due to the plaintiff.

For the foregoing reasons, the judgment of the Circuit Court of Mercer County is affirmed, and the cause is remanded to the trial court for a recomputation of the correct amount of interest.

Affirmed and remanded with directions.

ALLOY, P. J., and STENGEL, J., concur.