2024 IL App (2d) 240031
No. 2-24-0031
Opinion filed December 12, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 10-CF-4384 11-CF-142 |
| DONALD J. MISCHKE JR., | ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Kennedy concurred in the judgment and opinion.
Justice Jorgensen dissented, with opinion.

**OPINION**

¶ 1    After a bench trial, defendant, Donald J. Mischke Jr., was convicted of first degree murder (felony murder) (720 ILCS 5/9-1(a)(3) (West 2010)) and driving under the influence of a controlled substance (cocaine) (DUI) (625 ILCS 5/11-501(a)(6), (d)(1)(A) (West 2010)) and was sentenced to concurrent prison terms of 26 and 7 years, respectively. On appeal, he contended that, *inter alia*, the trial court erred in making the sentences concurrent, as they were mandatorily consecutive. *People v. Mischke*, 2014 IL App (2d) 130318, ¶ 6 (*Mischke I*). We agreed, vacated the imposition of concurrent sentences, and remanded for resentencing. *Id.* ¶¶ 8, 25. On remand,

the trial court imposed the same sentences but made them consecutive. *People v. Mischke*, 2018 IL App (2d) 160472, ¶ 7 (*Mischke II*). Defendant appealed, and we affirmed. *Id.* ¶¶ 1, 19.

¶ 2     Defendant then petitioned *pro se* for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-7 (West 2018)), contending that (1) the evidence did not prove felony murder beyond a reasonable doubt, (2) his trial counsel and his counsel in his initial direct appeal (appellate counsel) were ineffective for failing to raise the reasonable-doubt issue, and (3) appellate counsel was ineffective for contending that the sentences must be consecutive. Defendant retained postconviction counsel, who filed a supplemental petition. The trial court granted the State's motion to dismiss the petition. Defendant appeals. We affirm.

¶ 3                                         I. BACKGROUND

¶ 4     In case No. 11-CF-142, defendant was charged with felony murder[1] and DUI. The felony murder charge alleged that defendant, while in flight from the police after committing a burglary (720 ILCS 5/19-1(a) (West 2010)), drove his vehicle into a vehicle driven by Elisha Idleburg, causing her death. The case was joined for trial with case No. 10-CF-4384, in which defendant was charged with aggravated fleeing or attempting to elude a peace officer (625 ILCS 5/11-204.1(a)(1) (West 2010)), burglary, and retail theft (720 ILCS 5/16A-3(a) (West 2010)).

¶ 5     We turn to the trial evidence pertinent to this appeal. The testimony of three employees of the Target store at 3050 North Lewis Avenue in Waukegan established that, at approximately 2 a.m. on December 23, 2010, an individual drove a black Mazda into the store's locked entrance door, forcibly opening it, and entered the store. The employees called the police.

¶ 6     Waukegan police officer Cesar Garcia testified as follows. He was dispatched to a Target store at approximately 1:50 a.m. on December 23, 2010. He was in full uniform and driving a

---

[1]Several other charges were later dismissed on the State's motion.

marked squad car. A car was parked on the south side of the building. A man, later identified as defendant, exited the store carrying a large package. He put the package inside the car and got into the driver's seat. With his emergency lights activated, Garcia approached the car, drew his gun, and ordered defendant out. Defendant drove away. Garcia entered his squad car, radioed other officers, and drove off after defendant.

¶ 7    Garcia pursued defendant through the alley behind the Target and another store and then across the parking lot. When defendant left the parking lot and drove south on Lewis Avenue, Garcia turned off his emergency lights and radioed that he was ending the pursuit. Nonetheless, Garcia continued south on Lewis Avenue. He saw a squad car driving north in the southbound lane, head-on toward defendant's car. Defendant swerved around the squad car and continued south on Lewis Avenue. Officer Alfonso Cancino radioed that he was now pursuing defendant. Shortly afterward, Officer Aaron Murauskas radioed from the intersection of Belvidere Road and Green Bay Road that he was at the site of an accident with personal injuries. Garcia went there and saw that defendant's car was one of the vehicles involved in the crash. Garcia estimated that he received Murauskas's notification about five minutes after he saw defendant's vehicle exit the parking lot onto Lewis Avenue.

¶ 8    Cancino testified that, when he learned of the Target burglary, he drove at a high speed north on Lewis Avenue. He saw defendant's car driving south on Lewis Avenue. Cancino activated his emergency lights and entered the southbound lane to stop defendant's car. Defendant continued south at a high speed and swerved around Cancino's squad car by temporarily entering the northbound lane. Defendant then continued south on Lewis Avenue. Cancino made a U-turn and headed south on Lewis Avenue at approximately 105 miles per hour. However, he was unable to catch up with defendant. Defendant ran a red light at the intersection of southbound Lewis Avenue

and Sunset Avenue. Cancino lost sight of defendant's car and discontinued his pursuit. However, Cancino still attempted to locate defendant's car.

¶ 9    Waukegan police officer John Szostak testified that he was on patrol at about 2 a.m. on December 23, 2010, driving north in a marked squad car near Grand Avenue and North McAree Road. He heard a dispatch about the Target burglary and that Garcia was pursuing defendant south on Lewis Avenue. Szostak activated his lights and continued north on McAree Road, but when he arrived at McAree Road and West Ridgeland Avenue, the sergeant in command radioed all units to cease the pursuit. Szostak made a U-turn and drove south on McAree Road. He saw defendant's car travel west on West Glen Flora Avenue and cross McAree Road, well over the 30-mile-per-hour posted speed limit. Szostak turned onto McAree Road and followed defendant. Defendant approached Frolic Avenue, stopped at the stop sign for several seconds, and headed south on Frolic Avenue. Szostak turned south on Frolic Avenue and followed defendant's car, which accelerated sharply and turned west on Grandville Avenue toward Green Bay Road. Szostak lost sight of defendant but proceeded to Green Bay Road and turned south. He heard Murauskas report the accident at Green Bay Road and Belvidere Road, so he activated his siren and emergency lights and drove there.

¶ 10    Szostak testified that, after the pursuit was called off, the police were still allowed to search for defendant's car.

¶ 11    Murauskas testified that he was driving his personal car home west on Belvidere Road at about 2 a.m. on December 23, 2010. As he approached Green Bay Road, he received a dispatch about the Target burglary. Murauskas saw a black vehicle traveling south on Green Bay Road at a high speed toward the intersection with Belvidere Road. Another vehicle was approaching the

intersection from the east. The black vehicle did not slow down for the red light and crashed into the driver's side of the other vehicle.

¶ 12    Waukegan police officer Barry Grabert, whom the trial court qualified as an expert in accident reconstruction, testified that he investigated the accident scene shortly after the crash. The black box from the victim's car showed that, one second before the accident, her car was traveling at 40 miles per hour. Based on various factors, Grabert determined that defendant was traveling at approximately 56 miles per hour at the time of the crash.

¶ 13    Lincolnshire investigator Adam Hyde, whom the trial court also qualified as an accident-reconstruction expert, testified that he investigated the case. At the time of the accident, the posted speed limit on both Green Bay Road and Belvidere Road was 35 miles per hour. Hyde concluded that, at the point of impact, the victim's car was traveling at 39 miles per hour and defendant's car was traveling at approximately 61 miles per hour.

¶ 14    The State rested. Defendant moved for a directed finding. He argued that, *inter alia*, the evidence was insufficient to prove felony murder beyond a reasonable doubt, because the victim's death was not "a foreseeable consequence of the *** burglary." Specifically, defendant contended that the evidence did not prove that the fatal crash occurred while he was still in flight from the police after committing the burglary. Defendant asserted that, at the time of the crash, "the pursuit had been called off; that *** the authorities lost sight of [defendant]; [and] that there was no effort[ ] on their part to stop him or even identify themselves to him." The trial court denied defendant's motion.

¶ 15    Defendant testified as follows. He admitted that he had committed burglary and theft at the Target. When Garcia confronted him, he drove off. Garcia initially pursued him. However, once he reached Lewis Avenue, he no longer saw Garcia's car. As he drove south on Lewis Avenue

"fairly fast," he saw a squad car, with its emergency lights activated, approaching him from the south in the same lane. Defendant swerved around the squad car and kept heading south. He lost sight of the squad car and saw no more emergency lights and heard no sirens. Turning right onto Glen Flora Avenue, he drove west and slowed down until he reached Frolic Avenue, where he stopped at the stop sign, turned onto Grandville Avenue, and drove to the intersection with Green Bay Road. There, he momentarily exited his car and walked around. He did so "[t]o see if there was [*sic*] any police." Defendant saw no police cars or other traffic.

¶ 16    Defendant testified that he then drove south on Green Bay Road, crossing the intersection with Grand Avenue at about 45 miles per hour. He saw no police cars. He passed the intersection with Washington Street and drove toward Belvidere Road, seeing no emergency lights, hearing no sirens, and keeping his speed steady. He was hoping to reach his "rendezvous point" in North Chicago. As he approached Belvidere Road, he looked for his cell phone underneath the passenger seat. When he looked up, he saw that the traffic light was red, but he decided to proceed, "gunn[ing] it" so that he would not end up in the middle of the intersection. He got into a collision and was taken to a hospital.

¶ 17    Defendant rested. The State did not present any rebuttal evidence.

¶ 18    In finding defendant guilty of felony murder, the trial court noted as follows. Defendant was pursued at high speeds for several minutes. Garcia testified that, even after ending the high-speed pursuit, he continued to follow defendant. Other officers saw defendant speeding through the red light at the intersection of Green Bay Road and Belvidere Road without braking or slowing down. The two expert witnesses estimated his speed on impact as 56 to 61 miles per hour, well above the speed limit.

¶ 19    The trial court continued as follows. A person commits felony murder if he kills a person without lawful justification and, in performing the acts that cause the person's death, "is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3) (West 2010). A defendant may also be held responsible for a death that occurs during an escape from a forcible felony.[2] *People v. Klebanowski*, 221 Ill. 2d 538, 546 (2006). Here, having committed burglary, a forcible felony (see 720 ILCS 5/2-8 (West 2010)), defendant was escaping from the police when he killed the victim. The killing occurred fewer than 10 minutes after the burglary and not far from the scene. The stolen goods were in the car defendant drove. Defendant consistently drove well over the posted speed limits. He admitted that, at one point, he stopped briefly to scout for police in the area. Further, he intended to drive until he reached a prearranged "rendezvous point," where he could dispose of the stolen goods.

¶ 20    Defendant filed a *pro se* posttrial motion raising numerous issues, including ineffective assistance of counsel. He alleged that trial counsel coerced him into testifying falsely about the route he took from the Target to the crash site. Defendant also claimed that the police had no good reason to pursue him, because they had already identified him and could apprehend him later. He claimed that the "[p]olice chase enhanced [his] fear to flee, which resulted in the accident."

¶ 21    At the hearing on the motion, defendant admitted committing perjury about the route he took from the Target. He reiterated that the police did not need to chase him, because they could have apprehended him later. The trial court asked defendant if he was suggesting that Garcia knew defendant's identity when he began the chase. Defendant then clarified that he was talking not

---

[2]On appeal, defendant quotes from the current statute, which expressly imposes liability for a death caused during "flight" from a forcible felony. See 720 ILCS 5/9-1(a)(3) (West 2022).

about Garcia's pursuit of him but about "the later chase which led to the accident." The following colloquy ensued:

"THE COURT: Okay. So you are saying that you were being chased before— immediately before the accident and that could have been avoided?

THE DEFENDANT: Chased the whole time.

THE COURT: Chased the whole time. Okay. And that you were actively trying to get away at the time that the accident occurred?

THE DEFENDANT: Yes.

THE COURT: ***

Police chase enhanced your fear to flee, which resulted in the accident. Your fear to flee resulted in the accident? Is that what you wrote [in the posttrial motion]?

THE DEFENDANT: Yes, sir."

¶ 22   The trial court denied the *pro se* motion and a separate posttrial motion filed by trial counsel. The court sentenced defendant to concurrent prison terms of 26 years for felony murder and 7 years for DUI. On appeal, appellate counsel contended in part that making the sentences concurrent violated section 5-8-4(d)(1) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-4(d)(1) (West 2010)), which required consecutive sentences when one of the offenses was first degree murder. *Mischke I*, 2014 IL App (2d) 130318, ¶¶ 6, 8. We agreed, vacated the imposition of concurrent sentences, and remanded for resentencing. *Id.* ¶¶ 8, 25. On remand, the trial court imposed the same sentences but made them consecutive. *Mischke II*, 2018 IL App (2d) 160472, ¶ 7. Defendant appealed, and we affirmed. *Id.* ¶ 1.

¶ 23   Defendant filed a *pro se* petition under the Act. Retained counsel later filed a supplemental petition incorporating the *pro se* petition. As pertinent here, defendant raised three claims: (1) the

evidence did not prove him guilty of felony murder beyond a reasonable doubt, because it failed to establish that he was fleeing the police when he killed the victim; (2) trial counsel was ineffective for failing to raise the reasonable-doubt issue, and appellate counsel was ineffective for not raising trial counsel's ineffectiveness in that regard; and (3) appellate counsel was ineffective for raising the concurrent-sentences issue, which ultimately led to resentencing and the imposition of a longer aggregate sentence.

¶ 24    In an affidavit attached to his petition, defendant gave the following account of his telephone conversation with appellate counsel regarding the issues to raise in the initial direct appeal:

"4. During our telephone conversation, which I believe occurred in the spring of 2014, [appellate counsel] stressed to me that the only issues that could be raised on appeal were issues or problems concerning my sentence. Any errors concerning whether I should have been convicted could not be raised.

5. I specifically remember [appellate counsel] telling me that there was an issue with regard to my receiving concurrent as opposed to consecutive sentences. He informed me that the trial court had erred in giving me concurrent sentences and wanted to discuss with me whether we should raise the issue on appeal. At that time[,] [appellate counsel] advised me that I should consider abandoning the appeal.

6. I asked [appellate counsel] whether the issue of concurrent as opposed to consecutive sentences could be raised by the prosecution at some point in time in the future. [Appellate counsel] advised me that at the time of my release it was possible that the prosecution could review my sentence and raise the fact that the trial court had erred in

granting me concurrent sentences. *Based on that concern, I authorize* [*sic*] [*appellate counsel*] *to raise the issue of the consecutive versus concurrent sentences on appeal.*

7. Obviously, if I had been informed or believed that I would only have had to spend 26 years instead of 33 years on my sentence, I never would have authorized [appellate counsel] to prosecute an appeal on my behalf which resulted in me getting another seven years on my sentence." (Emphasis added.)

¶ 25   The State filed a motion to dismiss the petition. Docket entries indicate that the motion was heard and granted on December 12, 2023. However, the record contains no report of proceedings for December 12, 2023, or order dismissing the petition. Defendant timely appealed.

¶ 26                                II. ANALYSIS

¶ 27   The State has moved to strike defendant's brief and dismiss the appeal. We took the motion with the case. The State contends that the record is insufficient for proper review because it contains no report of proceedings (*i.e.*, a transcript or an appropriate substitute (see Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017))) of the hearing on the State's motion to dismiss or of the trial court's oral ruling on the motion (the trial court's docket entries offered no rationale for the dismissal). As a result, the State concludes, we "ha[ve] no basis to examine the trial court's factual findings or the reasoning for its legal conclusions." For the following reasons, we deny the State's motion.

¶ 28   In ruling on a motion to dismiss a postconviction petition at the second stage of proceedings under the Act, the trial court takes as true all well-pleaded facts that are not positively rebutted by the trial record and decides whether the petition has made a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Because this issue is purely one of law, our review is *de novo*. *Id.* Moreover, because we review a trial court's judgment, not its reasoning,

we may affirm on any basis called for by the record, regardless of whether the court relied on it. *People v. Everette*, 141 Ill. 2d 147, 158 (1990).

¶ 29    Given these principles, the incompleteness of the record here in no way hinders our review. Contrary to what the State implies, we need not examine either the trial court's "factual findings"—it made none—or its reasoning. Thus, we turn to the merits of defendant's appeal.

¶ 30    Defendant's first contention of error combines two related arguments. First, he argues that the evidence was insufficient to prove him guilty of felony murder beyond a reasonable doubt, because the State did not establish that he caused the accident while still fleeing from the police. Second, he argues that trial counsel was ineffective for failing to move for a directed finding on this ground. Neither argument has merit.

¶ 31    We reject the first argument because a claim of insufficient evidence does not allege a constitutional deprivation and, thus, falls outside the Act. See *People v. Flores*, 2022 IL App (2d) 210757, ¶ 26.

¶ 32    Moreover, even were the claim cognizable under the Act, defendant forfeited any relief by admitting at the posttrial hearing that he was indeed fleeing the police when he crashed. In a colloquy with the court, defendant volunteered that, even after Garcia ceased his high-speed pursuit, there was a "later chase" that "caused the accident." He then stated that he had been "[c]hased the whole time," including up to the moment of the collision. Next, the trial court asked defendant whether he was "actively trying to get away at the time that the [crash] occurred," to which he answered, "Yes." Defendant had already testified that he committed the burglary and that he caused the accident that killed the victim. His sole defense to the felony-murder charge had been that, at the time of the collision, he was no longer fleeing the police. Thus, his clear statements

to the court that he *was* fleeing the police up to the time of the collision constituted an admission of guilt to felony murder. See 720 ILCS 5/9-1(a)(3) (West 2010).

¶ 33    "A judicial confession, voluntarily made, is binding upon the accused, *** whether the confession takes the form of a plea of guilty or is found in other statements made in court in the course of legal proceedings." *People v. Green*, 17 Ill. 2d 35, 42 (1959). After making such a confession, the defendant may not question the legal sufficiency of the evidence against him. *Id.* In *Green*, the court held that the defendant made a binding judicial confession when, after the trial court found him guilty and sentenced him, the defendant stated in open court, " 'I committed the crime.' " *Id.* at 39. As in *Green*, defendant's judicial confession here barred a later claim of insufficient evidence.

¶ 34    We turn to defendant's second argument—that he made a substantial showing that trial counsel was ineffective for failing to move for a directed finding on the ground of insufficient evidence of flight. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, absent counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010).

¶ 35    The most noteworthy flaw of defendant's argument is that, as to the performance prong of *Strickland*, its factual premise is just wrong. As we have set out, trial counsel *did* move for a directed finding on the precise basis defendant now raises. By defendant's own standards, counsel performed reasonably.

¶ 36    Moreover, denying the motion for a directed finding was amply justified.

"The purpose of a motion for a directed finding in a criminal trial is to test the constitutional sufficiency of the evidence by determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" *People v. Williams*, 2017 IL App (1st) 152021, ¶ 26.

For purposes of a motion for a directed finding, the defendant admits the truth of the facts stated in the prosecution's evidence, and the trial judge does not pass upon the weight of the evidence or witness credibility in testing the sufficiency of the evidence to withstand the motion. *Id.*

¶ 37　Defendant's argument is based on the theory that, once the police called off the high-speed pursuit, he could no longer be fleeing from them. This theory overlooks two points. The first is that there was abundant evidence that the officers continued trying to locate defendant even after the pursuit was called off. Garcia, Szostak, and Murauskas testified that they followed defendant's car well after the high-speed pursuit was terminated.

¶ 38　The second point is that there was also ample evidence that, whether or not the officers were still looking for defendant, he was still trying to elude them. Defendant testified that, when he reached Green Bay Road, he exited his car, walked around, and looked "[t]o see if there was [*sic*] any police." Thus, by his own admission, very shortly before the crash, defendant was trying to avoid apprehension. Further, the undisputed fact that he ran a red light immediately before the crash was compelling evidence that he was still trying to flee *at the very moment of impact*.

¶ 39　We hold that the trial court properly held that defendant failed to make a substantial showing that trial counsel was ineffective for neglecting to raise the reasonable-doubt issue.

¶ 40　We turn to defendant's remaining claim of error. He contends that appellate counsel was ineffective for arguing in his initial direct appeal that the trial court erred in imposing concurrent

sentences. Defendant does not contend that the argument lacked merit; he concedes that section 5-8-4(d)(1) of the Unified Code required consecutive sentences. See 730 ILCS 5/5-8-4(d)(1) (West 2010). Instead, defendant argues that appellate counsel was ineffective for raising the issue at all. He reasons that, had counsel remained silent, we would not have disturbed the trial court's erroneous decision, thus sparing him what later turned out to be a longer aggregate sentence.

¶ 41 The State responds that appellate counsel cannot be found ineffective for declining to perpetrate deception by silence on this court. The State notes that, under Rule 3.3(a)(2) of the Illinois Rules of Professional Conduct of 2010, "[a] lawyer shall not *** fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel." Ill. R. Prof'l Conduct (2010) R. 3.3(a)(2) (eff. Jan. 1, 2010). The State reasons that it was not unreasonable or unprofessional performance for appellate counsel to obey the clear dictate of a binding rule of professional conduct.

¶ 42 We affirm the trial court's decision, but not on the basis urged by the State. See *Everette*, 141 Ill. 2d at 158 (the reviewing court may affirm on any basis called for by the record, regardless of whether the trial court relied on it). The record shows that, after appropriate consultation with appellate counsel, defendant made an informed decision to argue in his initial direct appeal that the trial court erred in imposing concurrent sentences.

¶ 43 "There is a strong presumption that counsel's challenged conduct was within the range of reasonable professional assistance, and the burden is on [the] defendant to overcome this presumption." *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 84. "What a reasonable attorney would do is guided by, among other things, the Rules of Professional Conduct." *People v. Leuze*, 282 Ill. App. 3d 126, 128 (1996). In his affidavit attached to the supplemental

postconviction petition, defendant described his conversation with appellate counsel about whether to raise the concurrent-sentences issue and defendant averred that appellate counsel failed to advise him properly before he decided to raise that issue. The standard for judging the adequacy of appellate counsel's consultation with defendant is Rule 1.4 of the Illinois Rules of Professional Conduct of 2010, which addresses the attorney's duty to communicate with the client. Rule 1.4 states:

> "(a) A lawyer shall:
>
> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent *** is required by these Rules;
>
> (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
>
> (3) keep the client reasonably informed about the status of the matter;
>
> (4) promptly comply with reasonable requests for information; and
>
> (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.
>
> (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Ill. R. Prof'l Conduct (2010) R. 1.4 (eff. Jan. 1, 2010).

¶ 44 Under *Strickland*'s performance prong, which incorporates Rule 1.4, the question is whether appellate counsel provided all information "reasonably necessary to permit [defendant] to make [an] informed decision" about whether to argue on appeal that the trial court erred in imposing concurrent sentences. In our view, appellate counsel did just that. We quoted above

(*supra* ¶ 24) the pertinent portion of defendant's affidavit. However, we consider not only defendant's petition and affidavit but also the entire record of defendant's initial direct appeal, No. 2-13-0318. Defendant faults appellate counsel for what counsel argued in defendant's brief in that appeal, but our *Strickland* analysis is not limited to the brief. Rather, we consider any aspect of the record that indicates why counsel made that argument. It is well established that, in addressing a *Strickland* claim, we evaluate counsel's "entire performance" (*People v. Bell*, 373 Ill. App. 3d 811, 822 (2007)), based on the "entire record" in the case (*People v. Flores*, 128 Ill. 2d 66, 107 (1989)). The record of the initial direct appeal includes appellate counsel's oral argument, which reveals—consistent with defendant's affidavit—that counsel duly consulted with defendant before challenging the concurrent sentences.

¶ 45    During that oral argument, appellate counsel acknowledged that, if we vacated defendant's sentences and remanded for resentencing, the trial court could impose an aggregate sentence longer than 26 years. Particularly, he recognized, the trial court could reimpose the existing sentences but make them consecutive, for an aggregate sentence of 33 years. But appellate counsel also recognized that, "theoretically," the court "could give [defendant] less." We then asked appellate counsel whether defendant was "aware of these risks." We specifically mentioned the risk that his aggregate sentence could be increased on remand due to misconduct since sentencing. Appellate counsel responded, "I want to answer very carefully, because I have confidentiality restrictions, and I don't want to *** repeat my conversations with my client, other than to note that our office policy is to communicate[.]" Appellate counsel added, "And I comply with our office policies in every case[.]" We presume, and have no reason to believe otherwise, that appellate counsel's "communicat[ion]" with defendant conveyed both the risk and the potential benefit we had queried counsel about.

¶ 46    But, importantly, we need not rely on appellate counsel's statements alone, for defendant's own affidavit provides details on his consultation with appellate counsel. According to defendant, appellate counsel explained that the trial court improperly gave defendant "concurrent as opposed to consecutive sentences" and advised defendant to abandon his appeal rather than argue that the concurrent sentences were erroneous. Defendant admitted that, after appellate counsel advised him that the State could raise the issue later, he authorized appellate counsel to raise the issue immediately. Defendant followed this admission with an assertion that he would not have so authorized appellate counsel had he "been informed or believed that [he] would only have had to spend 26 years instead of 33 years on [his] sentence." Defendant's phrasing turned his intended point nearly on its head. He meant to say (as defense counsel clarified at oral argument in this appeal) that, if he had known that he might have to spend 33 years in prison rather than 26 years, he would not have raised the issue on appeal. However, any suggestion that defendant did not know the risk involved in raising the issue is rebutted by what he said previously in the affidavit. The popular meanings of "concurrent" and "consecutive" conveyed what was at stake. "[C]onsecutive" means "following one after the other in order." Meriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/consecutive (last visited Nov. 21, 2024) [https://perma.cc/28UK-7VEX]; see *People v. Carney*, 196 Ill. 2d 518, 525-26 (2001). "[C]oncurrent" means "operating or occurring at the same time." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/concurrent (last visited Nov. 21, 2024) [https://perma.cc/A2GX-DFYE]. Thus, defendant would have realized the risk that the trial court would simply take the sentences it had ordered be served at the same time and order that they be served one after the other, resulting in a *longer* aggregate sentence. Indeed, if defendant had not realized that risk, he would not have been concerned enough to ask appellate counsel if the State

could, on its own initiative, challenge the consecutive sentences at a later point. When appellate counsel confirmed that the State could (see *People v. Castleberry*, 2015 IL 116916, ¶¶ 26-27), defendant opted not to leave well enough alone and accept appellate counsel's recommendation to forgo the challenge. Rather, he acted on the possibility of receiving a positive benefit from raising the challenge—the possibility that, even if the trial court imposed consecutive sentences at resentencing, the trial court might impose individual terms that would result in a *shorter* aggregate sentence.

¶ 47    From defendant's affidavit and appellate counsel's statements at oral argument, it is clear that appellate counsel informed defendant that (1) challenging the concurrent sentences might result in a shorter aggregate sentence, the same aggregate sentence, or a longer aggregate sentence and (2) electing not to raise the sentencing issue would not eliminate the threat of a longer aggregate sentence, because the State could raise the error on its own. We conclude that appellate counsel's representation was reasonable and allowed defendant to make a fully informed and voluntary decision, which he did by electing to raise the concurrent-sentences issue on appeal.[3]

_____

[3]At oral argument in this appeal, defendant's attorney represented that he read the entire record. We have as well, and we find that it rebuts at several points defendant's claim that, when he brought his initial direct appeal, he was unaware that challenging his concurrent sentences could result in a longer aggregate sentence. For instance, at the resentencing hearing, defense counsel said, "I understand the law says when a sentence is remanded that was concurrent [and] it needs to be consecutive[,] the same numbers can be imposed without any constitutional concerns even though it may result in the defendant actually serving some additional time once [the] sentence[s] [are] consecutive." This was the moment for defendant himself to speak up if he truly had not

¶ 48    Defendant has also failed to establish under *Strickland* a reasonable probability that the outcome would have been different had defendant opted not to raise the concurrent-sentences issue on appeal. It is not reasonably likely that 26 years or more would have elapsed without the State noticing that the sentences were mandatorily consecutive and filing a mandamus action to enforce the statutory requirement. See *id.* Therefore, defendant's ineffective-assistance argument fails.

¶ 49    The dissent believes that we are "gap-filling" by tapping "unauthorized" sources to reach our conclusion. *Infra* ¶¶ 62-63. We disagree, as we are examining only the sources that the Act and supreme court precedent permit us to consider. The dissent seems to object primarily to our consideration of the oral argument in the initial direct appeal, but the dissent cites authority for the broader proposition that "[a] court will not take judicial notice of the contents of its records except in the proceeding pending before it" (*People v. Hunt*, 357 Ill. 39, 40 (1934); see *People ex rel.*

---

understood that his aggregate sentence could be increased on resentencing. Revealingly, he said nothing.

Later, defendant attached to his *pro se* postconviction petition (ultimately incorporated into postconviction counsel's supplemental petition) certain correspondence between himself and appellate counsel (and counsel's direct supervisor) about issues to raise in defendant's second direct appeal (his appeal following resentencing). Defendant's handwritten notes on a piece of correspondence from appellate counsel suggest that defendant was upset because appellate counsel did not raise all issues defendant wanted in his initial direct appeal. Notably, although that appeal resulted ultimately in a longer aggregate sentence, defendant did not suggest that he was upset that appellate counsel brought the concurrent-sentences challenge, as he understandably would have been if appellate counsel had not duly consulted with him.

*Zilm v. Carr*, 265 Ill. 220, 229 (1914)). This rule appears to have been abrogated, or at least significantly restricted. See *People v. Davis*, 65 Ill. 2d 157, 164 (1976) (noting that cases such as *Carr* "would appear to preclude a judge from taking judicial notice of the orders or decrees entered in other cases in the court in which he presides" but holding that "[t]o the extent that [*Carr* and such cases] may be thought to create an inflexible rule requiring formal proof of earlier court records only by authenticated or certified copies of those records and proof identity, they are incompatible with considerations of judicial economy and efficiency essential to the disposition of present-day caseloads"); *Filrep, S. A. v. Barry*, 88 Ill. App. 3d 935, 939 (1980) (noting that *Davis* "expressed a more flexible approach to the question of judicial notice" than prior cases).

¶ 50     In any event, the *Carr*/*Hunt* rule obviously is not applied in postconviction proceedings, in which defendants are permitted to allege errors occurring in prior proceedings in the case and courts address those claims without any hint of a procedural impediment to reviewing the prior proceedings. Indeed, the Act expressly authorizes the court, at the first stage of postconviction proceedings, to "examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding[,] and any transcripts of such proceeding." 725 ILCS 5/122-2.1(c) (West 2018). Review at the second stage is not any narrower. The only caveat is that "[t]he Act itself contemplates that the trial court will look only to the record of the subject petitioner's case," and, thus, the court may not "consider the record of proceedings not involving the petitioner whose case is before the court." *People v. Sanders*, 2016 IL 118123, ¶¶ 43-44. Contrary to the dissent's characterization, defendant's initial direct appeal is not merely "a related appeal" (*infra* ¶ 63) but, rather, is a prior proceeding *in this case*, which we can and must consider in evaluating defendant's ineffectiveness claim. Moreover, supreme court precedent clearly permits us to consider the oral argument in that  appeal. See *People v. Jones*, 109 Ill. 2d

19, 24 (1985) (on appeal from the second-stage dismissal of the defendant's postconviction petition, the supreme court considered appellate counsel's explanation at oral argument on direct appeal as to why he did not argue the ineffectiveness of trial counsel). Our considering the initial direct appeal—including the oral argument—is a routine exercise of a court's authority under the Act to consider prior proceedings while evaluating a postconviction claim that alleges error in those proceedings. The dissent suggests some kind of distinction between the trial court and the reviewing court as to what they may consider in evaluating a postconviction claim. But our very function as a reviewing court permits, and indeed requires, us to "step into the shoes of the circuit court" (the dissent's phrase (*infra* ¶¶ 63-64)) inasmuch as we consider, like the trial court, the prior proceedings that the postconviction claim implicates—here, the initial direct appeal and appellate counsel's performance. Our review would not be meaningful otherwise.

¶ 51　　The dissent believes that appellate counsel's statements during oral argument "do not rebut defendant's assertions that he was not properly informed about, and *understood*, the difference between concurrent and consecutive sentences and the virtual absolute increase of his sentence to 33 years' imprisonment." (Emphasis in original). *Infra* ¶ 65. The dissent focuses on defendant's conclusional (and garbled) assertion in the affidavit that he would not have challenged the consecutive sentences had he known that he might receive a longer aggregate sentence. As explained, the remark is rebutted by details in the remainder of the affidavit, in which defendant acknowledges that he was informed of the sentencing error and decided to raise it on appeal against the advice of appellate counsel and despite the risk of a longer aggregate sentence.

¶ 52　　The dissent is also mistaken that defendant did not appreciate the likelihood that he would receive a longer aggregate sentence on remand. Defendant was told that his concurrent sentences were essentially a windfall; he could hardly have failed to realize the good chance that the trial

court would adopt the simplest remedy on remand: reimpose the original individual sentences and make them consecutive. After all, as defendant admits, appellate counsel advised him to abandon the appeal.

¶ 53                                    III. CONCLUSION

¶ 54     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 55     Affirmed.

¶ 56     JUSTICE JORGENSEN, dissenting:

¶ 57     I respectfully dissent for two reasons. First, I cannot agree with the majority's gap-filling methods used to conclude that appellate counsel performed reasonably. Second, I depart from the majority's finding that the well-pleaded facts did not demonstrate a substantial showing of prejudice. Accordingly, I would remand this cause for a third-stage hearing where both appellate counsel and defendant could testify to the content and circumstances of any communication.

¶ 58                            I. Unreasonable Performance

¶ 59     In considering whether there was a substantial showing that appellate counsel's performance fell below an objective standard of reasonableness, the majority *presumes* that defendant made an "informed decision" and that appellate counsel had an "appropriate consultation" with defendant, without *evidence* to rebut the well-pleaded facts contained in the affidavit and without facts to support this, contrary, conclusion.

¶ 60     Defendant's affidavit and the contents of *this* record do not support a finding that an appropriate consultation occurred. Here, defendant's affidavit is silent as to whether counsel informed defendant, and he *understood*, the risk of and virtually guaranteed exposure to an increased sentence if appellate counsel raised any issue regarding defendant's sentence on appeal. To the contrary, defendant's affidavit states that counsel told him that (1) there was an issue

regarding his concurrent sentences, (2) he should consider abandoning the appeal, and (3) the prosecution could move to have his sentence corrected if the error was discovered. Additionally, defendant's affidavit states, "had [defendant] been informed or believed that [he] would only have had to spend 26 years instead of 33 years on [his] sentence, [he] never would have authorized [appellate counsel] to prosecute an appeal on [his] behalf which resulted in [him] getting another seven years on [his] sentence." The implication here is that defendant did not *understand* the difference between concurrent and consecutive sentences and that he was either not *informed* or did not *understand* that he would certainly face an increase of seven years in his aggregate sentence if he affirmatively addressed his sentence on appeal. Specifically, any argument during his resentencing hearing that his sentence was excessive would necessarily start at a 33-year sentence, not 26; thus, defendant would necessarily have to argue for a 7-plus year sentencing reduction to see any benefit above his sentence prior to the initial direct appeal. Nothing in this record shows that defendant was *informed* of that probability or that he *understood* it.

¶ 61    The majority acknowledges these facts and yet presumes otherwise. See *supra* ¶ 45. First, the majority's complaints regarding defendant's poor grammar in his affidavit do nothing to rebut his clear claims that he was not informed, and *did not understand*, that he would face an increase of seven years in his aggregate sentence if he addressed his sentence on appeal. Second, the majority's argument that the "popular meaning" of "concurrent" and "consecutive" sentences conveyed the stakes is not well taken. The majority presumes that defendant understood the differences between concurrent and consecutive sentences. However, there is no evidence to support this supposition. As defendant is not a lawyer, judge, or member of the criminal justice system, I cannot presume, as the majority has, that he actually understood the "popular meaning" of those words and the risks and consequences associated therewith. The foregoing is precisely the

type of information that should be gleaned from a third-stage hearing. Finally, the majority asserts that "defendant acknowledges that he was informed of the sentencing error and decided to raise it on appeal against the advice of appellate counsel and despite the risk of a longer aggregate sentence." *Supra* ¶ 51. However, the majority glosses over the distinct points of the affidavit to support its result. Here, the affidavit stated that defendant was informed that a sentencing *issue* existed; however, nothing in the record confirms that defendant was told what concurrent and consecutive sentences meant (*i.e.*, that the nature of the sentencing error was explained to him) or how that would virtually ensure an increased aggregate sentence. Moreover, the majority's supposition that defendant was *informed of*, and *understood*, the risk of a longer aggregate sentence is not supported by the record. In fact, the well-pleaded facts show that defendant *was not* informed and *did not* believe that he would have a longer aggregate sentence if he chose to appeal. There is nothing in this record that rebuts defendant's claims, and the question of fact remains: what information was conveyed during appellate counsel's consultation with defendant to support a conclusion that defendant understood the risks and benefits of an appeal? These questions should be resolved at a third-stage hearing.

¶ 62 Next, I disagree with the majority's use of gap-filling methods in finding that an appropriate consultation occurred. To conclude that defendant's well-pleaded facts have been rebutted, the majority asserts that, after reviewing counsel's "entire performance," based on the "entire record," counsel consulted with defendant—specifically, about the near certainty that appealing defendant's concurrent sentences would result in an increased aggregate sentence after a new hearing. I disagree for three reasons.

¶ 63    First, the majority's review of the "entire record" is unauthorized, as its extrajudicial review required investigation into the record from a related appeal[4] (defendant's initial direct appeal), the contents of which were not included in the record in this appeal, as oral argument recordings or transcripts from a direct appeal are not listed as documents included in the record on appeal for collateral review. See Ill. S. Ct. R. 321 (eff. Oct. 1, 2021) (content of record on appeal). Moreover, the Act does not support the majority's review of the evidence. As the majority acknowledges, " '[t]he Act itself contemplates that the *trial court* will look only to the record of the subject petitioner's case.' " (Emphasis added.) *Supra* ¶ 50 (quoting *Sanders*, 2016 IL 118123, ¶ 43). Accordingly, neither the Act nor case law supports the majority's conclusion that it may step into the shoes of the circuit court and comb the record in a related appeal to support a finding of reasonable, professional assistance. See *supra* ¶ 50. Instead, both *Flores* and *Bell* are examples of the appellate court examining the contents of the *present appellate record* before it to find reasonable assistance. And in *Jones*, 109 Ill. 2d at 24, appellate counsel's explanation regarding a claim of ineffective assistance of trial counsel was discussed at oral argument but, more importantly, it was in the *present* record before the appellate court because the explanation was raised in the circuit court during postconviction proceedings. These cases do not support the majority's expansive review beyond the record here.

---

[4]The majority takes issue with our use of the term "related appeal"; however, collateral proceedings are not a part of the original appeal, are civil in nature, are given a separate case number, and have historically been considered "related" in this court. *People v. Harris*, 2016 IL App (1st) 141778, ¶ 16; *People v. Gandy*, 227 Ill. App. 3d 112, 142 (1992).

¶ 64    Second, the majority's quoted discussion from the oral argument in defendant's initial direct appeal should not be judicially noticed without notice to the parties. Pursuant to Illinois Rule of Evidence 201, even when a court may take judicial notice, the parties are entitled to request an opportunity to be heard on the "propriety of taking judicial notice and the tenor of the matter noticed." Ill. R. Evid. 201(e) (eff. Jan. 1, 2011). No opportunity was provided at the oral argument on September 5, 2024, and no subsequent opportunity has been granted by this court. Moreover, here, we should not take judicial notice of counsel's argument in a related appeal. Even in a case involving the same parties and the same subject matter, "[a] court will take judicial notice of its own records and thus dispense with proof identifying such records, but it will not take judicial notice of the contents of any of its records except the one in the proceeding before it." *Carr*, 265 Ill. 220, 229 (1914); see *Hunt*, 357 Ill. 39, 40 (1934). Even to the extent that this holding has been relaxed for judicial economy, case law and Illinois Rule of Evidence 201 do not allow an appellate court to step into the shoes of the circuit court, comb a related record, and then rely on the facts therein without following the procedure laid out in the in Rule 201 or the Act. At a bare minimum, the parties should have been informed of the majority's intent to take judicial notice, and supplemental briefing should have been utilized to address the persuasiveness of this evidence. I depart from the majority's attempts to circumvent Rule 201 and the Act to create a documentary third-stage review hearing on appeal.

¶ 65    Finally, even if we assume that the oral argument from a prior appeal was a part of the record in this appeal, the majority relies on counsel's vague and *unsworn* statements that do not rebut defendant's assertions that he was not properly informed about, and *understood*, the difference between concurrent and consecutive sentences and the virtual absolute increase of his sentence to 33 years' imprisonment. Here, the majority notes that, in defendant's initial direct

- 26 -

appeal, a justice asked appellate counsel if he discussed with defendant the risk of an increased sentence by filing an appeal attacking his incorrect, concurrent sentences. *Counsel did not answer the question* or divulge what he discussed with defendant. Indeed, we appreciate that he could not at that time because of confidentiality restrictions. Instead, counsel merely stated it was office policy to communicate with a defendant and he followed office policy. Counsel's excerpt from the oral argument does not tell this court what counsel told defendant or whether defendant understood the risks of filing his appeal, and it certainly does not rebut defendant's well-pleaded claim that he was *not* informed of the risk that any argument to reduce his sentence would start from 33 years, not 26. In other words, he was not informed of the *likelihood* that the circuit court would not reduce his sentence more than seven years. Even counsel's advice to defendant to abandon the appeal rings hollow if counsel failed to properly explain the sentencing issue so that defendant *understood* the risks associated with addressing the issue on direct appeal. These issues can and should be resolved at a third-stage hearing, where counsel's confidentiality restrictions would be lifted and counsel could testify, under oath, about the details of his consultation. Ill. R. Prof'l Conduct (2010) R. 1.6(b)(5) (eff. Jan. 1, 2016).

¶ 66                                    II. Prejudice

¶ 67    Next, I believe that defendant has made a substantial showing of prejudice. Here, the majority notes that it is not reasonably likely that 26 years would pass without the State noticing the circuit court's sentencing error. The record suggests otherwise, as 21 months had already passed (March 8, 2013, to December 29, 2014) between the date defendant was sentenced and the date we issued our decision notifying the circuit court of its sentencing error. Appellate counsel was the first and only person to notice the error and bring it to the court's and the parties' attention, in the opening brief of defendant's initial direct appeal. Even when the case was fresh in the minds

of the circuit court, the prosecutor, and defense counsel, the error was not caught at the sentencing hearing, during the postsentencing review, or during the motion to reconsider the sentence. Moreover, it seems outside the bounds of reason to further assume that nonlegal prison personnel would identify a legal error that was overlooked by the circuit court and the parties. Accordingly, I find that it was reasonably likely that defendant would have received the benefit of the circuit court's error but for appellate counsel's intervention.

¶ 68　Finally, even considering the fact that we cannot "unring the bell" and reinstate defendant's concurrent sentences, there remains an adequate remedy at law. Here, the adequate remedy is a third-stage hearing where, if defendant is successful, the circuit court could grant a new sentencing hearing where the sentencing judge could consider the prior circuit court's error and defendant's claim that appellate counsel's ineffectiveness resulted in defendant's current sentence. While there certainly is no guarantee that defendant would receive a decreased sentence, defendant would have the opportunity to argue for the reformation of his sentence. Accordingly, I believe this case should proceed to a third-stage hearing.

---

*People v. Mischke*, 2024 IL App (2d) 240031

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 11-CF-142, 10-CF-4384; the Hon. Mark L. Levitt, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Darrell Dunham, of Carbondale, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Adam J. Rodriguez, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---