2025 IL App (2d) 240604-U
No. 2-24-0604
Order filed December 8, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE, OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 07-CF-2986 |
| MARK A. DOWNS, | ) ) | Honorable Donald Tegeler, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Procedural default bars our consideration of whether appellate counsel provided ineffective assistance because the issue is raised for the first time on appeal. The trial court correctly dismissed defendant's postconviction petition at the second stage because (1) an impeachment witness known but not called to testify would have only testified to collateral and nonmaterial issues, and (2) trial counsel was not ineffective due to an actual conflict of interest.

¶ 2    This case returns to us for the sixth time,[1] and this appeal concerns defendant Mark A. Downs's appeal of the judgment of the circuit court of Kane County dismissing his postconviction

---

[1] *People v. Downs*, 2012 IL App (2d) 100755-U (*Downs I*) (appeal of first-stage dismissal of posttrial claims of ineffective assistance of trial counsel (see *People v. Krankel*, 102 Ill. 2d 181 (1984)));

petition at the second stage. Defendant argues that appellate counsel was ineffective for failing to argue that the evidence was insufficient to sustain his conviction, that trial counsel was ineffective for failing to call a known impeachment witness, and that trial counsel was operating under an actual conflict of interest. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4      The facts of this case have been fully presented in our previous dispositions, and we provide only a salient outline of the offense and summarize the facts pertinent to this appeal. In 1996, Ruben Davila switched his allegiance from the Latin Home Boys gang to the Almighty Ambrose gang. Davila had been close friends with Robert Saltijeral, a high-ranking Latin Home Boy gang member, and there was evidence that Davila retained friendly feelings toward Saltijeral even after he switched gangs. Saltijeral was also the uncle of the victim in this case, six-year-old Nico Contreras.

¶ 5      Early in November 1996, Davila was shot at, but uninjured, in the driveway of his mother's home; his car was damaged in the incident. Davila recognized that Latin Home Boy members shot at him, and there was evidence that he identified Saltijeral as a shooter, but at trial, Davila denied

---

*People v. Downs*, 2014 IL App (2d) 121156 (*Downs II*) (appeal of jury question regarding reasonable doubt and *Krankel* counsel's conduct of hearing); *People v. Downs*, 2015 IL 117934 (*Downs III*) (reversing *Downs II* on reasonable-doubt issue); *People v. Downs*, 2016 IL App (2d) 121156-B (*Downs IV*) (appeal considering representation of *Krankel* counsel); *People v. Downs*, 2017 IL App (2d) 121156-C (*Downs V*) (following supervisory vacation of *Downs IV*, again considering representation of *Krankel* counsel); *People v. Downs*, 2022 IL App (2d) 200280-U (*Downs VI*) (procedural direct appeal, substantive appeal of outcome of *Krankel* hearing following a full evidentiary hearing).

Saltijeral participated. Davila reported the shooting to the Ambrose, and after a meeting with various gang members, was instructed to retaliate by shooting at Saltijeral.

¶ 6     On November 10, 1996, Davila, defendant, and Elias Diaz drove to Saltijeral's house where Davila was to "take care of business," and perform the retaliatory shooting. Davila and defendant approached the rear of the house, and Davila argued with defendant that Saltijeral had not been the gang member who shot up his car. Defendant remained insistent that Davila shoot Saltijeral, and the impasse continued for approximately 15 minutes. Defendant finally took Davila's gun and claimed that he would perform the shooting as a favor to Davila because of all Davila had done for the Ambrose.[2] Davila claimed to have turned away, heard gunshots, and he and defendant ran back to the car where Elias was waiting for them.

¶ 7     In the morning, Davila learned that Saltijeral had not been killed, but Contreras had been. Alejandro Solis, at the time, the second-in-command of the Ambrose, was outraged that his gang was responsible for killing a child and resolved to kill Davila, who had been assigned to shoot at Saltijeral. At a meeting between Solis, defendant, and Davila, he realized that defendant had been the shooter and had killed the child. He decided to spare them because he felt he would have to kill defendant, his friend, Davila, and his driver. Solis also testified that, in the years following the Contreras murder, defendant spiraled downward, unable to keep jobs and having relationship

---

[2]Davila had been involved in numerous gang shootings on behalf of the Ambrose, including the execution-style murder of Tony Yepiz; in exchange for his testimony against defendant and others, Davila received plea deal in which he would not be charged with the murders of Yepiz or Contreras, he would be recommended for a boot camp program and, if he did not complete the boot camp, would serve an eight-year term of imprisonment. Additionally, Davila received nearly $39,000 for expenses and to support his family in Mexico.

problems. At a party, Solis told defendant his young daughter was cute, and defendant broke down, confessing to Solis that he had recurrent nightmares about the Contreras murder in which he could see the bullets going through the window before they struck the child.

¶ 8     Solis also received a favorable plea deal. He had become a paid informant for law enforcement, and, while he denied there was a *quid pro quo* deal for his testimony in this case, immediately after its conclusion, Solis had a 30-month sentence of imprisonment vacated and a new 30-month sentence of parole imposed instead. Solis also received over $8,000 from the authorities, some of which was paid for his information about the Contreras murder.

¶ 9     At trial, Davila was heavily and thoroughly impeached. Billie Mireles and Angelica Gonzalez each testified that Davila told them, at separate events, that he had been the shooter and had killed the child. The State eventually identified over 20 instances of effective impeachment presented against Davila.

¶ 10     Notwithstanding Davila's extensive impeachment, the jury returned a guilty verdict, and defendant was sentenced to a 70-year term of imprisonment. Defendant filed a *pro se* motion following trial pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) claiming that trial counsel had been ineffective, and the fits and starts in this postverdict proceeding occupied the pages of *Downs I – V*. In *Downs V*, we ordered that the *Krankel* hearing finally proceed to conclusion. In *Downs VI*, defendant appealed the results of the *Krankel* hearing, even though, procedurally, the matter was ripe for an appeal of all issues arising from the trial, along with any infirmities left from the *Krankel* hearing. We affirmed the trial court's judgment in *Downs VI*, 2022 IL App (2d) 200280-U, ¶ 52, that trial counsel had not provided ineffective assistance.

¶ 11     On February 28, 2024, defendant filed his amended postconviction petition. The amended petition alleged that trial counsel had an actual conflict of interest related to his previous representation of Frank Aquino rendering his representation ineffective because Aquino's

information was not investigated, whose claims that Davila confided to him that he was the shooter in the Contreras murder were not investigated, that appellate counsel was ineffective for failing to raise the Aquino conflict-of-interest issue, and that trial counsel was ineffective for failing to interview and utilize Roberto Ramirez, who would have impeached Davila about the location of the meeting during which Davila was instructed to retaliate against Saltijeral. The State moved to dismiss the amended postconviction petition.

¶ 12     On September 20, 2024, the trial court granted the State's motion to dismiss. The court expressly determined that Davila had been so thoroughly impeached at trial that any additional impeachment that Aquino or Ramirez could have provided would have had no impact on the outcome of the case. The court determined that defendant had suffered no prejudice resulting from the alleged instances of ineffective assistance, and that the issues were also forfeited and barred by the doctrine of *res judicata*.

¶ 13     Defendant timely appeals.[3]

¶ 14                                            II. ANALYSIS

¶ 15     On appeal, defendant argues that the trial court erroneously dismissed his postconviction petition. Specifically, defendant contends that he made a substantial showing that direct appellate

---

[3]During this appeal, defendant has been represented by the Exoneration Project, and specifically, the two postconviction attorneys who filed his postconviction and amended postconviction petitions. On March 13, 2025, the Exoneration Project moved for leave to allow the two postconviction attorneys to withdraw and to substitute another Exoneration Project appellate attorney in their stead. The new attorney explained that she brought the motion to allow her the ability to raise an unreasonable-assistance-of-postconviction-counsel claim, should that be required. On March 21, 2025, we granted the motion to withdraw.

counsel was ineffective for failing to challenge the sufficiency of the evidence in the direct appeal. Defendant also contends that he made a substantial showing that trial counsel was ineffective for failing to investigate and call a known witness who would have further impeached Davila, and, related, that trial counsel was operating under an actual conflict of interest regarding the impeachment witness.

¶ 16                              A. Postconviction Claim Framework

¶ 17    We begin with the familiar procedural framework of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)).  The Act allows a convicted defendant to challenge his or her conviction by alleging it was due to the substantial denial of federal or state constitutional rights, or both.  *People v. Cotto*, 2016 IL 119006, ¶ 28.  The Act creates a three-stage process for adjudicating claims.  *Id.*  In the first stage, the trial court is obligated to determine whether the defendant's petition is frivolous or patently without merit.  *Id.*  If the petition is not dismissed at the first stage, it is advanced to the second stage.  *Id.*

¶ 18    At the second stage, the defendant must make a substantial showing of a constitutional violation.  *Id.* ¶ 28.  The trial court may appoint counsel to represent the defendant, and counsel must amend the petition as necessary to present the defendant's claims; likewise, at this stage, the State may file a motion to dismiss, or it may file an answer to the petition.  *Id.* ¶ 27.  The petition will be dismissed if the defendant is unable to make the necessary showing; otherwise, it will be advanced to the third-stage evidentiary hearing for adjudication.  *Id.* ¶ 28.

¶ 19    Turning to the second-stage consideration of a postconviction petition, a trial court takes as true all well-pleaded allegations that are not positively rebutted by the record in making its determination whether the defendant made a substantial showing of a constitutional violation.  *People v. Mischke*, 2024 IL App (2d) 240031, ¶ 28.  The issue, therefore, is purely a legal one, and our review of the trial court's determination is *de novo*.  *Id.*

¶ 20   The overriding purpose of a postconviction proceeding is to allow inquiry into constitutional infirmities involved in the defendant's conviction and sentence that were not, and could not have been, adjudicated in a direct appeal. *People v. English*, 2013 IL 112890, ¶ 22. Thus, issues that were raised and adjudicated on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been, but were not, raised on direct appeal are forfeited. *Id.* Nevertheless, the doctrines of *res judicata* and forfeiture will be relaxed where required by considerations of fundamental fairness, where the forfeiture arises from appellate counsel's ineffective assistance, or where the facts relating to the issue do not appear on the face of the direct appellate record. *Id.*

¶ 21                                    B. Sufficiency of the Evidence

¶ 22   Defendant first contends that appellate counsel provided ineffective assistance by failing to include a claim that the evidence was insufficient to convict in defendant's direct appeal. As an initial matter, the State contends that the claim is forfeited because it could have been raised in the direct appeal, but was not. See *id.* (issues that could have been raised on direct appeal, but were not, are forfeited). The State argues that, by not raising sufficiency of the evidence in his postconviction petition, the issue is procedurally defaulted in this appeal because it cannot be raised for the first time on appeal. *People v. Jones*, 213 Ill. 2d 498, 505 (2004) ("a claim not raised in a petition cannot be argued for the first time on appeal"). We agree. Defendant's postconviction appeal raised three issues: (1) trial counsel was ineffective because he had an actual conflict of interest related to Aquino, (2) appellate counsel was ineffective for not raising the actual conflict issue on direct appeal, and (3) trial counsel was ineffective for failing to investigate and present Ramirez's testimony. Absent from the postconviction petition is any claim that the evidence was insufficient to support defendant's conviction. Accordingly, because the claim of sufficiency of the evidence was not included in the postconviction petition and is presented for the first time on

appeal, it must be deemed procedurally defaulted, and we are without authority to address it. See *id.* at 508 (intermediate reviewing court cannot relax procedural default through exercise of supervisory power because only the supreme court possesses such supervisory authority).

¶ 23 Defendant argues that a party need only preserve an issue, such as ineffective assistance of counsel, to avoid a procedural default on appeal because only the claim must be preserved, not the actual arguments made in support. We disagree with how defendant frames this contention. While ineffective assistance of counsel is certainly a claim, it is only generic and conclusory without a specific action or omission by the attorney to round out the claim. See *People v. Williams*, 2024 IL 127304, ¶ 22 (to establish ineffective representation of counsel, a defendant must demonstrate that the attorney's performance was deficient, and the defendant was prejudiced from the deficient performance). The deficient act or omission is not simply an argument underlying the claim of ineffective assistance; it is part and parcel of the ineffective assistance claim. Defendant's framing misses the mark.

¶ 24 Additionally, the authority on which defendant relies for this framing is distinguishable. Defendant argues that *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 18, and *Brunton v. Kruger*, 2015 IL 117663, ¶ 76, both stand for the proposition that only the claim need be preserved; arguments on appeal are not limited to those made in the court below. In *1010 Lake Shore*, 2015 IL118372, ¶ 18, our supreme court held that, while the argument about canons of statutory construction had not been presented in the courts below, the issue of the proper interpretation of the Condominium Construction Act had been consistently disputed. *Id.* By contrast, here, the issue of the sufficiency of the evidence had not been raised before, so that issue was unpreserved for our consideration. In *Brunton*, 2015 117663, ¶ 76, our supreme court held that the issue of whether accountant-client privilege had been waived due to a disclosure had been preserved where the waiver issue was consistently placed in issue in the courts below, and

that the reason for avoiding waiver of the privilege was only an argument in support of the party's position. By contrast, here, the issue of sufficiency of the evidence simply had not been raised until defendant argued for the first time in this case in this appeal. Defendant also relies on *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 5, for the proposition that arguments and authorities utilized in an appeal are not strictly limited to those used in the trial court. Here, because an issue of ineffective assistance requires specific identification of the defect in performance and the resulting prejudice, the failure to have raised the sufficiency of the evidence means that the claim was not raised in the trial court, and *Rodriguez-Aranda* is therefore distinguishable.

¶ 25    Defendant argues that postconviction counsel provided unreasonable assistance by failing to include allegations concerning appellate counsel's failure to raise the issue of the sufficiency of the evidence. This approach is unavailing. Following the resolution of the *Krankel* hearing, defendant appealed, and we issued our decision in *Downs VI*, which stood, procedurally, as the direct appeal of defendant's conviction and sentence. Defendant, through retained counsel, the Exoneration Project, filed his postconviction petition and amended postconviction petition. The individual attorneys responsible for defendant's postconviction petition filed his notice of appeal, and, on March 11, 2025, they filed an initial brief. On March 13, 2025, the Exoneration Project sought the withdrawal of the original individual attorneys because it and defendant had identified a possible issue of unreasonable assistance of the individual attorneys in their postconviction representation of defendant. On March 20, 2025, pursuant to the State's motion, defendant's initial appellate brief was stricken, and on March 21, 2025, the individual attorneys from the Exoneration Project were allowed to withdraw. Thereafter, on April 22, 2025, defendant, represented by new individual counsel (albeit still associated with the Exoneration Project), filed his amended initial appellate brief. Before us, defendant argues that the original individual postconviction counsel

provided unreasonable assistance because they did not include the issue of the sufficiency of the evidence in the postconviction petition.

¶ 26    *Jones*, 213 Ill. 2d at 505, squarely precludes our ability to address this issue as well. It states, flatly, that an issue not raised in the postconviction petition cannot be addressed for the first time on appeal. We understand *Jones* to apply to the postconviction process as well: if the issue was not broached during the proceedings, either by including it in the postconviction petition, any amended postconviction petition, or orally during any hearings on the postconviction petition, then it is procedurally foreclosed from our review because it simply cannot be raised for the first time on appeal. *Id.*

¶ 27    Defendant argues that we should nonetheless address his claim of unreasonable assistance of postconviction counsel because it is plainly evident from the face of the record, citing *People v. Turner*, 187 Ill. 2d 406, 413-14 (1999). *Turner* is unavailing because it was a death-penalty case over which our supreme court had jurisdiction and the appellate court could not hear. *Id.* at 408. Moreover, to address such a claim despite the procedural default would require supervisory authority, and only our supreme court possesses such authority. *Jones*, 213 Ill. 2d at 507-08.

¶ 28    Defendant's reliance on other unreasonable assistance of postconviction counsel cases is also unavailing. Defendant cites *People v. Delgado*, 2022 IL App (2d) 210008, ¶ 34, for the proposition that postconviction may have provided unreasonable assistance for failing to raise a potentially meritorious issue. However, in *Delgado*, the postconviction petition included a challenge to the defendant's "mandatory sentence" but was otherwise inadequately framed and presented. *Id.* ¶¶ 11-13. The *Delgado* court, therefore, could address the unreasonable assistance claim because the claim underlying postconviction counsel's deficient performance had been raised in the postconviction proceedings.

¶ 29    Similarly, in *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 36, the court reversed the dismissal of the defendant's postconviction petition where it determined postconviction counsel had been deficient for failing to amend the defendant's *pro se* postconviction petition to include a claim of ineffective assistance of appellate counsel.  However, that claim of ineffective assistance was raised orally during the hearing before the trial court.  Therefore, it was, however imperfectly, before the trial court and, therefore, postconviction counsel's unreasonable assistance could be addressed by the court without running afoul of the prohibition in *Jones.*

¶ 30    Likewise, in *People v. Schlosser*, 2012 IL App (1st) 092523, ¶ 26, the court determined that postconviction counsel provided unreasonable assistance because counsel did not amend the defendant's postconviction petition, violating his duties under the Supreme Court Rule 651(c) (eff. Dec. 1, 1984). The court noted that postconviction counsel had orally argued that appellate counsel was ineffective for failing to raise the claim of insufficient evidence but did not amend the defendant's postconviction petition to include that claim, leading the trial court to conclude that the issue had been forfeited.  *Id.* ¶ 25.  Thus, in *Schlosser*, too, the issue had been raised, albeit imperfectly, and the appellate court's decision to address whether postconviction counsel rendered unreasonable assistance did not contradict the requirement of *Jones.*

¶ 31    *Jones* is categorical: in the postconviction setting, a claim not included in the defendant's postconviction petition may not be raised for the first time on appeal absent the exercise of supervisory powers which, as an intermediate court of review, we do not possess. *Jones*, 213 Ill. 2d at 505.  Similarly, we hold that a claim of unreasonable assistance of postconviction counsel may not be addressed for the first time on appeal unless the underlying defect in the representation has, in some way, even if imperfectly, been presented to the trial court.  In the cases defendant relies upon here, either the supreme court could exercise its supervisory authority to address the unreasonable assistance claim on appeal (*Turner*), or the underlying defect had been presented to

the trial court allowing the appellate court to be able to address the unreasonable assistance claims (*Delgado*, *Kirk*, and *Schlosser*). Accordingly, absent an exercise of supervisory authority, defendant cannot here circumvent the bar of procedural default to allow us to address the merits of his claim that appellate counsel provided ineffective assistance for failing to raise the issue of the sufficiency of the evidence.

¶ 32 Defendant is not without recourse. Procedural default may be relaxed in certain instances, including where required by fundamental fairness. *Id.* Fundamental fairness in the context of postconviction proceedings, however, is narrowly defined as satisfying the cause-and-prejudice test necessary to be satisfied when seeking to file a successive postconviction petition. *Id.* Defendant is free to pursue such relief if he chooses.

¶ 33 Procedural default from raising the sufficiency issue for the first time on appeal aside, we also note that we have previously passed upon the issue of the sufficiency of the evidence, albeit in the context of whether the evidence was closely balanced for purposes of a plain error analysis. *Downs II*, 2014 IL App (2d) 121156, ¶ 30 ("the evidence presented in this case was sufficient to prove defendant's guilt beyond a reasonable doubt, we do not believe that it was overwhelmingly in favor of the State"). We did not at that time elaborate on our reasoning, and we remedy that lack now.

¶ 34 It is well settled that, when a defendant challenges the sufficiency of the evidence, the reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. All reasonable inferences from the evidence must be drawn in favor of the prosecution. *Id.* The reviewing court will not disturb the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory that there is a reasonable doubt of the defendant's guilt. *Id.*

¶ 35    Davila provided a reasonable account of the circumstances that led up to the shooting as well as an account of the shooting itself that was neither inherently improbable or implausible nor physically impossible. See *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001) (evidence is insufficient if it is improbable, unconvincing, or contrary to human experience). Davila explained he was friends with Saltijeral before he switched his allegiance to the Ambrose and tried to resist naming Saltijeral as the person who had shot at him, triggering the events that culminated in the Contreras murder. Despite his efforts, at a gang meeting, Davila was ordered to carry out the retaliation. Davila was taken to the Saltijeral house by defendant and Diaz, and he and defendant exited the car to perform the shooting. Davila claimed that, at the house, he tried to dissuade defendant, but defendant insisted he shoot at the house. Davila claimed he refused, and defendant took the gun and performed the shooting himself, with Davila characterizing this as defendant giving him a break due to his service to the Ambrose (Davila had murdered Yepiz and had performed numerous other shootings on the gang's behalf). Nothing about this testimony is inherently implausible or contrary to human experience.

¶ 36    Solis testified that, as a high-ranking gang member, he was outraged about the killing of the Contreras child, and he decided to kill Davila, whom he disliked and distrusted because of his switch in gang allegiances. Defendant brought Davila to the meeting with Solis, but Davila would not enter the car where Solis and his driver awaited. Defendant entered and explained this to Solis. Eventually, defendant entered the car, and Solis confronted him about the child's murder. Defendant interceded, placing his hand upon Solis's shoulder and stating, "we didn't know," at which point Solis realized he would have to kill not only Davila, but his friends—defendant and the driver. Solis relented. Solis also described the effects of the Contreras murder in the years that followed, noting that defendant could not hold a job or maintain relationships. Solis further related that, at a party, defendant broke down emotionally in front of him, describing the nightmares he

was having about the murder of the Contreras child and seeing the bullets entering the child's window. This testimony supports defendant's direct involvement in the murder and is likewise neither inherently implausible nor contrary to human experience.

¶ 37 We also note that the jury was well aware that Davila and Solis were accomplices, that they had been thoroughly impeached both by the deals with the State for their testimony as well as by other witnesses offering contradictory testimony, and that the jury had been properly instructed about the scrutiny and caution to be applied to such testimony. Notwithstanding the infirmities, the jury, as fact finder, can accept some parts of a witness's testimony and reject other parts; it is the jury's responsibility to determine how the flaws in part of the testimony impact the credibility of the whole. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). We further note the longstanding principle that, despite the distrust of accomplice testimony, a single accomplice's testimony, whether corroborated or not, is sufficient to sustain a conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 48 (1989). This evidence, which was neither implausible, improbable, nor contrary to human experience, if believed by the jury, was sufficient to support defendant's guilt beyond a reasonable doubt, and undergirds our conclusion in *Downs II*, 2014 IL App (2d) 121156, ¶ 30.

¶ 38 Accordingly, for the reasons above, we hold that the procedural default of raising defendant's claim that appellate counsel provided ineffective assistance bars us from considering this issue on appeal.

¶ 39 C. Known Davila Impeachment Witness

¶ 40 Defendant argues that the trial court erred in rejecting his claim that trial counsel provided ineffective assistance by failing to interview and present Ramirez to impeach Davila about the meeting at which Davila claimed to have been assigned to shoot Saltijeral. According to defendant, Ramirez was known to trial counsel and willing to testify. Ramirez would have denied

that he was living at the location Davila testified the retaliation meeting took place in 1996, and, according to defendant, Ramirez would have denied that the meeting even occurred.

¶ 41　We can resolve this issue on grounds of prejudice. First, Ramirez averred that, in November 1996, he was not living in the Tall Oaks apartments and did not begin living there until some time in 1997, when he lived there with his sister. Ramirez also averred that no November 1996 meeting happened at the Tall Oaks apartment because he did not live there until 1997. Ramirez further averred, "I also was never present for any discussion related to a retaliatory shooting."

¶ 42　Ramirez's affidavit does undercut Davila's claim that the retaliation meeting occurred at Ramirez's apartment. However, he does not state that there was no meeting about retaliation, only that he was not invited to and did not participate in such a meeting, which is a distinct statement from no such meeting ever occurred. Had Ramirez averred that no meeting took place, instead of simply averring that he did not participate in one, we might have a different situation. The location of the meeting may go to Davila's general credibility, but, given the extensive impeachment provided at trial, we cannot say that this testimony would have provided the final straw to break the camel's back. We can discern no prejudice accruing from the omission of Ramirez's account at trial. Accordingly, we hold that the trial court correctly rejected this postconviction claim.

¶ 43　Defendant argues that, at the second stage, we must accept as true affidavits and well-pleaded allegations in the postconviction petition not directly rebutted by the record. *People v. Domagala*, 2013 IL 113688, ¶ 35. However, even accepting as true that the retaliation meeting could not have taken place at Ramirez's apartment, he fails to deny that the meeting took place. Thus, at best, Ramirez would have further impeached Davila on a wholly collateral issue and not disputed any of Davila's testimony on the material issues related to the circumstances which caused his and defendant's presence during the Contreras murder. Thus, the trial court could

properly determine that even more impeachment on a collateral issue would only have been cumulative, especially since, according to the State, Davila had been impeached in more than 20 other instances during the trial.

¶ 44                                    D. Trial Counsel's Conflict of Interest

¶ 45    Defendant last argues that that trial counsel acted under an actual conflict of interest. Defendant argues that trial counsel did not investigate Aquino's claims regarding statements Davila made to him in which Davila claimed responsibility for being the shooter in the Contreras murder. Specifically, Aquino provided an affidavit in which he averred that, in August 2008, he wrote to trial counsel to inform counsel of this information. Aquino averred that he was never contacted by counsel. Defendant argues that trial counsel's failure to investigate and call Aquino stemmed from his prior representation of Aquino and constituted an actual conflict of interest. We disagree.

¶ 46    It is well established that the right to effective assistance of counsel includes the right to conflict-free representation. *People v. Ayala*, 2022 IL App (1st) 192484, ¶ 115. Two types of conflict have been recognized in Illinois law: *per se* and actual. *Id.* To demonstrate an actual conflict, a defendant must show that counsel actively represented conflicting interests. *People v. Moore*, 189 Ill. 2d 521, 539 (2000). A defendant need not demonstrate that the conflict contributed to his conviction, but the defendant must demonstrate a specific defect in counsel's strategy, tactics, or decisions attributable to the conflict. *Id.*

¶ 47    Here, the trial court determined that the very experienced[4] trial counsel's decision regarding Aquino was a matter of strategy and that counsel had otherwise effectively represented

_____

[4]We note that, at the time of defendant's trial, trial counsel had been an attorney for about 25 years, had served as the public defender for about 15 years, had participated in hundreds of trials, with

defendant at trial. We agree. Aquino averred that he wrote to trial counsel and informed him that Davila had claimed responsibility for performing the shooting in the Contreras murder. Thus, counsel was aware, generally, of what benefit to defendant's case Aquino might offer. Counsel had previously represented Aquino, and, at the first iteration of the *Krankel* hearing, counsel testified that he used this knowledge to assess Aquino's general credibility in determining whether the benefit to defendant's case would be outweighed by the potential harm. Counsel believed that, because Aquino was serving a life term of imprisonment for murder, he had nothing to lose should he testify and could therefore lie with impunity. The court concluded from this record that counsel had simply made the strategic decision that the potential harm to defendant's case in calling Aquino far outweighed any benefits that could be attained. Moreover, two disinterested witnesses, Mireles and Gonzalez, provided testimony on defendant's behalf that defendant informed them he was the shooter. Thus, counsel was able to introduce the same information through less risky sources than a convicted murderer serving a life sentence.

¶ 48    We also note that defendant does not demonstrate how Aquino's interests conflicted with defendant's, so defendant is unable to show that there is even a conflict—only that before he represented defendant, trial counsel happened to represent Aquino. Aquino himself averred that he stood to gain nothing beyond the satisfaction of seeing "justice to be served to the families of the victim and of the wrongfully accused and convicted." We further note that Aquino's prosecution had been resolved before defendant's, and Aquino was already imprisoned. We therefore cannot conclude that Aquino had any intersecting interest that may have conflicted with

---

approximately 50 murder trials of which about half were capital murder trials. Additionally, counsel was a member of the capital litigation bar as a first-chair attorney and was sworn in with the initial group of litigators.

defendant's interests in the case. It is axiomatic that, for an actual conflict to exist, there must first be some conflict of interest or some inconsistent obligation to someone other than the client that dilutes counsel's allegiance to that client. *People v. Speitzer*, 123 Ill. 2d 1, 13-14 (1988). There is simply nothing apparent in the record from which we can conclude that counsel based his decision on anything more than a straightforward cost-benefit analysis of the possible effect of providing this information to the jury through a witness such as Aquino.

¶ 49 Finally, we note that trial counsel's determination of Aquino's likely credibility and effect was likely colored by his previous representation. However, because counsel had previous interactions in a completed previous representation does not translate to the type of situation in which we would necessarily conclude that counsel's allegiance to defendant was somehow compromised. If, for example, counsel had interviewed Aquino and come away with the impression that Aquino was a bad and untruthful potential witness, we see no effective difference in reaching this impression after such an interview than from reaching it after the course of the earlier representation. Accordingly, we hold that the trial court did not err in dismissing defendant's claim that counsel acted under an actual conflict of interest.

¶ 50 Defendant maintains that trial counsel possessed an actual conflict, pinning his argument to two sentences from *Ayala*. First, to "show an actual conflict of interest, a defendant must point to " 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " *Ayala*, 2022 IL App (1st) 192484, ¶ 126 (quoting *People v. Morales*, 209 Ill. 2d 340, 349 (2004)). Second, the "decision not to call [a witness] may certainly constitute a 'specific defect' in counsel's trial strategy." *Id.* ¶ 127. While the "specific defect" language in the first sentence accurately states how a court is to measure an actual conflict, the second sentence is too slender a reed to support defendant's contention. First, we note that the second sentence does not state a general rule; rather, it is applying the specific defect concept to the particular facts in that

case. *Id.* More importantly, however, the decision not to utilize a witness *may* constitute a specific defect sufficient to support a finding of an actual conflict, meaning that, depending on the context, it may also *not* constitute a specific defect in counsel's representation. *Id.* Moreover, *Ayala* determined first that the defendant's counsel may have operated under a *per se* conflict because he represented a prosecution witness who was also an alternate suspect in the same crime as the defendant. *Id.* ¶ 124. The actual conflict analysis was an alternate analysis for the trial court to employ when conducting an evidentiary hearing for the defendant's postconviction petition depending on whether the *per se* conflict was able to be substantiated. *Id.* ¶ 126. Thus, while the general rule given in *Ayala* accords with our discussion above, it is factually distinct and does not bear the weight of reliance defendant places upon it.

¶ 51 Defendant argues that he made a substantial showing of a specific defect—not investigating Aquino's claims—and this specific defect was caused by trial counsel's prior representation of Aquino. To the contrary, Aquino averred that he wrote to defendant's trial counsel that Davila had confided to him that he was the shooter in the Contreras murder twice, relating the times and circumstances when Davila made the two statements, so counsel clearly, by Aquino's own words, knew at least the contours and the timing of the purported statements. The record also demonstrates that the basic information was not unknown to counsel, who was able to introduce evidence that Davila told Mireles and Gonzalez that he had been the shooter in the Contreras murder, and neither Mireles nor Gonzalez carried the heavy criminal baggage that Aquino carried. Additionally, defendant does not explain how the decision not to meet with Aquino about already-known information was attributable to their previous attorney-client relationship, or how the decision not to call Aquino was also attributable to their previous attorney-client relationship rather than a cost-benefit assessment considering the risks of placing the murderer Aquino on the stand versus introducing the same information through the more anodyne

sources of Mireles, Gonzalez, and the police officer who interviewed them. By not closing that loop, defendant's argument fundamentally fails because he does not show that counsel's challenged action resulted from his prior representation of Aquino.

¶ 52 Defendant contends that the trial court imposed a requirement that he must show actual prejudice resulting from the conflict of interest. We disagree. Defendant's argument fails because he has not demonstrated the existence of a conflict of interest in that he has not argued how not investigating Aquino's claims or not calling Aquino as a witness benefited Aquino at defendant's expense. In short, as discussed above, defendant simply has not demonstrated that counsel's prior representation constituted a conflict of interest. Effectively, defendant appears to concede that he must demonstrate an actual conflict of interest but expects it to be treated as a *per se* conflict. See *id.* ¶¶ 115-16 (a "*per se* conflict arises when the attorney had or has 'a tie to a person or entity' that would benefit from a verdict unfavorable to the client;" a *per se* conflict arises in three circumstances: (1) when counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution, (2) when counsel contemporaneously represents a prosecution witness, and (3) when counsel was a former prosecutor personally involved in prosecuting the defendant). Thus, defendant asserts that trial counsel's prior relationship with Aquino, standing alone, explains the specific defects of not investigating Aquino's claims or calling Aquino as a witness. Because defendant has conceded that the trial counsel's relationship with Aquino constitutes an actual conflict, not a *per se* conflict, he is foreclosed from relying on the fact of the relationship alone.

¶ 53 Defendant argues that the trial court erred by determining that he forfeited this claim or that it was barred by *res judicata*. Because we have rejected defendant's contention on its merits, we need not address whether the trial court could also rely on forfeiture or *res judicata*.

¶ 54    Similarly, defendant argues that the trial court erroneously deemed that this actual conflict claim was simply a recharacterization of the ineffective assistance issues already addressed in the earlier appeals.  As we have addressed its merits, we need not further consider the trial court's framing of the issue.

¶ 55                                        III. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 57    Affirmed.